PEOPLE v NELSON

Docket No. 94714. Argued May 5, 1993 (Calendar No. 10). Decided
    September 8, 1993.

Tommie L. Nelson and Mark S. Jones were charged with posses-
    sion of less than twenty-five grams of cocaine. The Jackson
    Circuit Court, Gordon W. Britten, J., suppressed evidence ob-
    tained by the police following an investigatory stop of their
    vehicle and dismissed the case, holding that the stop violated
    their Fourth Amendment rights against unreasonable searches
    and seizures. The Court of Appeals, SULLIVAN, P.J., and
    WEAVER and JANSEN, JJ., affirmed in an unpublished opinion
    per curiam (Docket No. 139042). The people appeal.

In an opinion by Justice BRICKLEY, joined by Justices BOYLE,
    RILEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

Under the facts of this case the law enforcement officers had
    a reasonable, articulable, and particular suspicion that the
    defendants had engaged in buying, attempting to buy, or deliv-
    ering drugs, and, thus, were justified in stopping the vehicle in
    which the defendants were riding.

1. There is no bright line rule to test whether the suspicion
    giving rise to an investigatory stop was reasonable, articulable,
    and particular. Common sense and everyday life experiences
    predominate over uncompromising standards. Therefore, defer-
    ence should be given to an experienced law enforcement officer
    who states that certain behavior by particular individuals
    exhibits a "carbon copy" of behavior the officer would otherwise
    believe to be a drug purchase. In analyzing the totality of the
    circumstances, law enforcement officers are permitted, if not
    required, to consider the modes or patterns of operation of
    certain kinds of lawbreakers and to draw inferences and make
    deductions.

2. Where a police officer observes unusual conduct that leads
    to a reasonable conclusion that in light of experience criminal
    activity may be afoot, the officer briefly may stop the suspicious
    person and make reasonable inquiries aimed at confirming or
    dispelling the suspicions. In balancing the competing interests,
    namely, the nature and quality of the intrusion of the defen-
    dants' Fourth Amendment rights with the government's inter-
    est in controlling the explosive existence of drugs, on the basis

of the facts of this case an investigatory stop was a minimal intrusion.

3. Because the police were justified in making the investigatory stop, they would have been justified in performing a protective patdown if they reasonably believed the defendants could have been armed and dangerous. Because the Court of Appeals found that the stop of the vehicle was unconstitutional, it was unnecessary for it to reach this issue and whether the patdown was within the parameters of *Terry v Ohio*, 392 US 1 (1968), requiring reversal and remand for further proceedings.

Reversed and remanded.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the departure from a known or suspected criminal location, without more, does not transform a person into a criminal, providing the basis for reasonable suspicion to temporarily stop and detain the person. Because, in this case, the record supports the trial court's conclusion that the police lacked an articulable, reasonable suspicion to believe that the defendants were involved in criminal activity, and because its decision to suppress the evidence was not clearly erroneous the judgment of the Court of Appeals should be affirmed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Joe Filip,* Prosecuting Attorney, and *Margo C. Runkle,* Chief Appellate Attorney, for the people.

*Cleophas Culp, Jr.,* and *Brian E. Thiede* for the defendants.

Amici Curiae:

*Bruce A. Barton* for the Criminal Defense Attorneys of Michigan.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Patrick Shannon,* President, Prosecuting Attorneys Association of Michigan, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the Prosecuting Attorneys Association of Michigan.

BRICKLEY, J. We granted leave to appeal to determine whether there was reasonable suspicion within the purview of the Fourth Amendment to perform an investigatory stop on a vehicle containing three males who, for approximately four minutes, visited a house that two weeks earlier had been raided for selling cocaine, continued to operate as a drug house as reported by a reliable informant, and that thirty minutes earlier was the site of a controlled buy. The Court of Appeals affirmed the decision of the circuit court that the stop violated the defendant's constitutional rights. The people appeal, and we now reverse.

I

On the evening of March 16, 1989, the Jackson police were told by a confidential, reliable informant that drugs were being sold at 515 Oak Street.[1] Just two weeks earlier, after keeping the house under surveillance long enough to witness a number of in-and-out quick stops typical of drug transactions, all of which resulted in arrests for cocaine possession, a search warrant was issued for the house and resulted in cocaine and drug paraphernalia being found on the premises. One of the occupants of the house, Ms. Ivy Torry, told the officer performing the search, who was also in charge of the present case, that she indeed had been selling cocaine from the house.

On the basis of that information the police arranged for the informant to make a controlled purchase with marked bills. The police searched the informant and the informant's car, and gave the informant $60. The informant was unable to personally enter the house, but arranged for some-

[1] The officer in charge stated that on about twenty occasions this particular informant had given accurate information about drugs.

one else to actually purchase the cocaine.[2] At 9:00
P.M., surveillance officers followed the informant
and the buyer to 515 Oak Street, where the buyer
entered the house for approximately three min-
utes, and, upon returning to the car, gave the
informant a packet of cocaine and $10 in change.[3]
The informant was wearing a wireless microphone
through which the police heard the buyer state
that "Miss Torry had run out of drugs, and she
sent Mr. Conner over to the south side to find Mr.
Nelson."[4] The buyer stated that he paid $50 for
what was received.

The officer in charge proceeded to obtain a
search warrant, while other officers maintained
surveillance of the house. After approximately
thirty minutes, the defendants were observed in
an older model Camero driving up to the house.
All three entered the house and remained there
for only four minutes. One of the detectives watch-
ing the house testified that on the basis of his
twenty-three years experience, the defendants' be-
havior was characteristic of a "crack-house" buy:
"a short visit, in/out, back in the car and down
the road." It was described as a "carbon copy" of
what had occurred two weeks earlier.

A few moments after the defendants left the
house, they were stopped by the police to investi-
gate the possible drug transaction. There was con-
flicting testimony by the law enforcement officers
at the scene regarding the exact order of the

[2] This second person and the informant had conducted a similar
exchange two weeks earlier at the same residence, providing the
police with probable cause to obtain the search warrant at that time.

Although this buyer did not know at either time that the purchase
was for the police, the buyer was considered reliable on the basis of
the previous purchase.

[3] A field test later confirmed that the substance contained cocaine.

[4] There is no corroborating evidence, other than the testimony of
the officer in charge, that "Mr. Nelson" referred to the defendant,
Tommie Nelson.

events that transpired.[5] The detective stated that
for the officers' protection and to prevent any
evidence from being destroyed, the front seat pas-
sengers were directed to place their hands on the
dashboard and the person in the back was directed
to place his hands on the head rest of the seat in
front of him. He stated further that he approached
the driver and, while he was asking the driver for
his license and information about the vehicle, he
observed an open bottle of beer on the floor be-
tween the driver's legs. At that point, the detective
testified, the defendants were ordered out of the
car and subjected to a full search for weapons and
contraband.

The officer at the scene testified that he ap-
proached the passenger's side of the Camero as the
detective approached the driver's side. The right
front passenger was asked to step from the vehicle
and was searched for weapons and contraband.
The rear seat passenger, defendant Jones, was
then asked to get out of the car and was patted
down, revealing an open bottle of gin in his belt.
The circuit court found that "[t]he occupants were
ordered out of the car based upon the officers'
belief that people involved in drug trafficking quite
frequently did have weapons, and thereafter, open
intoxicants were found, arrests were made, and a
search of the vehicle and of the persons revealed
crack cocaine." Later, upon booking, more cocaine
was discovered in the socks of defendant Jones.

The defendants were charged with possession of
less than twenty-five grams of cocaine. MCL
333.7403(2)(a)(v); MSA 14.15(7403)(2)(a)(v).[6] At an

---

[5] This conflicting testimony has a bearing on whether the patdown
was within the parameters of *Terry.* However, while defendant Jones
argues that issue in this Court, it was not addressed by the Court of
Appeals, and therefore, we only deal with the validity of the stop of
the automobile.

[6] The defendants were bound over by the district judge, who re-

evidentiary hearing the circuit court held that the evidence must be suppressed and dismissed the case because the stop and search violated the constitution. The Court of Appeals affirmed, being "of the opinion that the police did not possess sufficient reasonable, particularized and articulable suspicion that these particular defendants were engaged in criminal activity."

We take the contrary view.[7]

## II

The conduct of the police in this case implicates the Search and Seizure Clause of the Fourth Amendment of the United States Constitution.[8] The type of intrusion authorized by *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), has been extended to permit investigative stops under various circumstances for what has been called " 'special law enforcement needs.' " See *People v Shabaz,* 424 Mich 42, 58, n 6; 378 NW2d 451

jected the challenge to the investigatory stop. The defendants then filed motions in the circuit court to quash the information arising from the search because it was the result of an invalid stop. The motions were granted; however, the Court of Appeals reversed, holding that it was error to grant the motion without an evidentiary hearing.

[7] "This Court will not disturb a trial court's ruling at a suppression hearing unless that ruling is found to be clearly erroneous." *People v Burrell,* 417 Mich 439, 448; 339 NW2d 403 (1983). Although the trial judge's resolution of a factual issue is entitled to deference, *id.,* the facts of the present case are not in dispute. Hence, we are faced with the strict application of a constitutional standard to uncontested facts. Application of constitutional standards by the trial court is not entitled to the same deference as factual findings.

[8] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." US Const, Am IV. In this case, seeing no reason to interpret the Michigan constitutional protection from unreasonable searches and seizures, Const 1963, art 1, § 11, differently from its federal counterpart, under *Mapp v Ohio,* 367 US 643, 655; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), our inquiry begins and ends with an analysis of the Fourth Amendment of the United States Constitution. *People v Faucett,* 442 Mich 153; 499 NW2d 764 (1993).

(1985). In order for law enforcement officers to make a constitutionally proper investigative stop, they must satisfy the two-part test set forth in *United States v Cortez*, 449 US 411; 101 S Ct 690; 66 L Ed 2d 621 (1981). The totality of the circumstances as understood and interpreted by law enforcement officers, not legal scholars, must yield a particular suspicion that the individual being investigated has been, is, or is about to be engaged in criminal activity. *Id.* at 418. That suspicion must be reasonable and articulable, *Terry* at 21, and the authority and limitations associated with investigative stops apply to vehicles as well as people. *United States v Sharpe*, 470 US 675, 682; 105 S Ct 1568; 84 L Ed 2d 605 (1985).[9]

### III

The Court of Appeals in this case suggests that the defendants could have been at the house for any number of reasons, and that "presence, alone, is not sufficient to give rise to a particularized suspicion of criminal activity." However, the absence of apparent innocent behavior has never been a requirement for the suspicion required to make an investigatory stop. *United States v Sokolow*, 490 US 1, 9; 109 S Ct 1581; 104 L Ed 2d 1 (1989). The question is not whether the conduct is innocent or guilty. Very often what appears to be innocence is in fact guilt, and what is indeed entirely innocent may in some circumstances provide the basis for the suspicion required to make an investigatory stop. Thus, the focus is on the " 'degree of suspicion that attaches to particular types of noncriminal acts.' " *Id.* at 10.

Similarly, defendant Jones argues:

---

[9] See *People v Faucett*, n 8 *supra*, for a review of the historical development of investigative stop jurisprudence.

If police had information that this residence at 515 Oak fit the description of the classic Detroit crack house then the police may have properly formed a reasonable suspicion that persons who stopped briefly at the premises were involved in drug activity, since it would have been unlikely that they would have been involved in any other activity.

In this case, since the police were dealing with a home where all the activities of life were conducted and the occasional sale of controlled substances was only a part of the total activities, police could not have formed a reasonable suspicion that Defendant's presence was for the purpose of purchasing drugs.[10]

As stated above, the question is not one of a "classic" crack house, likelihood or unlikelihood, or an "occasional sale." The question is the suspicion generated by a four-minute stop at 9:30 P.M. by a Camero containing three males at a house, not only suspected of, and under surveillance for, drug dealing, but which had a history of a prior successfully executed search warrant, a witnessed-controlled drug purchase, and reliable information that it continued to operate as a drug house.[11]

Defendants also argue that because the law

---

[10] Defendant Jones suggests that because the house was the home of two adults and a number of children, and because it contained the usual furnishings and personal items necessary for daily living, it was not the typical crack house found in Detroit that is usually abandoned and contains no more furnishings than necessary to conduct business. In contrast, the prosecutor argues that because one of the adults living in the house had admitted selling cocaine from the house and revealed who her supplier was, because drugs and paraphernalia had been found two weeks earlier, because cocaine had been found in every vehicle that left the house on the day of the first search, and because a controlled purchase had been witnessed the very day in question, this house would qualify as a crack house under anyone's definition.

[11] The defendants argue that the controlled purchase was flawed because the informant who was searched did not actually conduct the transaction, but a second individual who was not searched did.

enforcement officers overheard the buyer tell the informant that Ms. Torry had run out of drugs, they should have been on notice that there was no cocaine left in the house and thus could not possibly have formed the reasonable suspicion required to make an investigatory stop. This argument is invalid for a number of reasons, particularly because the various implications arising from the statement are all equally compelling. First, it confirmed that the house was operating as a drug house. Second, notwithstanding the dubious credibility of a drug dealer, we are not convinced that

Defendant Nelson suggests that it is possible that the buyer did not get the cocaine from the house, but rather sold the unwitting informant what he had in his possession at the time, making entrance to the house only a pretext, and therefore, that the officers could not have formed the reasonable suspicion required to stop the defendants. In support of this contention, the defendant states that there is nothing in the record indicating whether the fifty dollars of marked money was ever found.

While we do not comment on the validity of the warrant partially based on the "uncontrolled" purchase, as far as distrusting the suspicion garnered from the transaction for purposes of stopping the defendants, we note that "[t]he process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez* at 418. See also *Illinois v Gates,* 462 US 213, 233; 103 S Ct 2317; 76 L Ed 2d 527 (1983).

On the basis of the foregoing information applicable to the house alone, a search warrant was issued by a neutral and detached magistrate. While acknowledging that the evidence regarding the house is not particularized with respect to the persons in the car, we note that the standard for a search warrant is probable cause, which requires more than reasonable suspicion. *Sokolow* at 7. Further, the law enforcement officers had an interest in ensuring that no contraband or marked money left the house while awaiting the arrival of the search warrant. See *Michigan v Summers,* 452 US 692, 704-705; 101 S Ct 2587; 69 L Ed 2d 340 (1981). Moreover, courts have held that an "uncontrolled" purchase may be used to satisfy the requirements of probable cause, and the fact that the purchase is uncontrolled does not make it totally unreliable. *United States v Fluker,* 543 F2d 709, 713-714 (CA 9, 1976); *United States v Satterwhite,* 980 F2d 317, 321, n 5 (CA 5, 1992).

in the world of drug trafficking what this dealer told the buyer necessarily means that the house was completely without drugs. It may be that what was sold was all that Ms. Torry was willing to part with at the time.

Third, this statement by Ms. Torry alerted the officers to the fact that the supply, if indeed it was depleted, was going to be replenished shortly. The officers would have been watchful for some type of delivery—there is no reason why they should not have suspected the defendants to be making that delivery. Moreover, if the defendants did make the delivery, there is no suggestion that they would not have continued to possess some controlled substance after their departure. Finally, with a search warrant on the way, the police would be interested in ensuring that any contraband and the marked money remained in the house and did not escape via some accomplice or another drug transaction before the execution of the search warrant.

It is apparent that just as many illegal implications can be attributed to the conduct as legal ones, but as stated above, the question is not the number of scenarios that the imagination can conjure, but the degree of suspicion conferred on the seemingly legal conduct.[12]

There is no bright line rule to test whether the suspicion giving rise to an investigatory stop was reasonable, articulable, and particular. Common

---

[12] At the evidentiary hearing, defendant Jones argued:

The stop at this house, while it may fit the profile of a drug purchase stop, also fits the profile of somebody dropping off a birthday card, or stopping to pay a debt, or to be repaid on a debt, or to say hello, or to tell you I'll pick you up for work at 6:00 o'clock in the morning, or can you pick me up 'cause my car is broken down, or a thousand and one other legitimate things.

sense and everyday life experiences predominate over uncompromising standards. *United States v Sharpe, supra* at 686. Therefore, deference should be given to a law enforcement officer of twenty-three years who states that certain behavior by particular individuals exhibits a "carbon copy" of what the officer would otherwise believe to be a drug purchase. In analyzing the totality of the circumstances, the law enforcement officers are permitted, if not required, to consider "the modes or patterns of operation of certain kinds of law-breakers. From [this] data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *Cortez* at 418.[13]

A similar case was recently presented to the Minnesota Supreme Court. *State v Dickerson,* 481 NW2d 840, 843 (Minn, 1992), aff'd on other grounds 508 US —; 113 S Ct 2130; 124 L Ed 2d 334 (1993). In that case, two police officers observed the defendant leaving a house known for cocaine traffic, and the defendant, upon seeing the police officers, turned around and began walking in the other direction. On the basis of that information, the officers decided to stop the defendant to investigate further. The trial court held that the investigatory stop and protective patdown were justified under *Terry,* and the Court of Appeals and the Minnesota Supreme Court both agreed with that finding.

Simply being in a high crime area is certainly not enough evidence to meet the required level of suspicion, *Shabaz* at 60, but in *Dickerson* there

---

[13] The uniformed officers in marked units who conducted the investigative stop did not witness the alleged drug purchase. They were notified by the detective conducting the surveillance that the Camero was leaving the premises. It was apparently up to the detective to determine whether the vehicle and the behavior of its occupants fit the criteria of a drug purchase.

was something more, namely, evasive behavior upon seeing uniformed police officers. In the present case, there are also several added ingredients. First, there are three males visiting an operating drug house for merely four minutes, and, more importantly, the drug supply had diminished and was going to be replenished.

In the analysis of *Dickerson,* the United States Supreme Court stated the rule applicable to the present case as follows:

> "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot" the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions. [124 L Ed 2d 344.]

In balancing the competing interests at stake, namely, the nature and quality of the intrusion of an individual's Fourth Amendment rights with the government's interest in controlling the explosive existence of drugs, we think that on the basis of the facts of this case an investigatory stop is a minimal intrusion. *United States v Montoya de Hernandez,* 473 US 531, 537; 105 S Ct 3304; 87 L Ed 2d 381 (1985). See also *United States v Mendenhall,* 446 US 544, 561; 100 S Ct 1870; 64 L Ed 2d 497 (1980), and *United States v Place,* 462 US 696, 704; 103 S Ct 2637; 77 L Ed 2d 110 (1983).[14]

The detective in this case articulated at the

---

[14] Our holding in the present case is consistent with our decision in *Shabaz.* The facts of *Shabaz* reveal that the defendant came out of an apartment complex in a high crime area of Detroit and could have left any number of apartments, not necessarily one of the apartments in which trouble had previously occurred. In the instant case, the defendants left a single family dwelling that law enforcement officers knew to be the site of cocaine trafficking. Moreover, the officers who observed the defendant in *Shabaz* were in plain clothes and in an unmarked car. The defendant was placing a paper bag under his vest,

evidentiary hearing that he observed a four-minute stop by three persons at a house where police had just made a controlled purchase, and that was known as a house dealing in cocaine. Such behavior was indicative of drug trafficking, in particular, cocaine. There was no evidence to support the contention that the persons were delivering flowers or were there to read the water meter. It was 9:30 P.M., and social visits usually last longer than four minutes. With a search warrant on the way, the police should not be expected to simply allow this reasonably suspicious conduct to go unchecked.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. [*Adams v Williams,* 407 US 143, 145-146; 92 S Ct 1921; 32 L Ed 2d 612 (1972).]

IV

We hold that under the facts of this case the law enforcement officers had a reasonable, articulable, and particular suspicion that the defendants had engaged in buying, attempting to buy, or deliver-

and, when he saw what appeared to be two strange men watching him, he began to run. On the basis of those facts, we held that the police officers did not have the requisite particularized suspicion to stop the defendant. The only factors were carrying a paper bag and running from a plain-clothes officer in a high crime area. There was not the entry, short stay, and exit from a house known to be the site of drug sales and expecting a delivery of drugs, that we have in the present case.

ing drugs, and, thus, were justified in stopping the vehicle in which the defendants were riding.[15]

Because the police were justified in making the investigatory stop, they would be justified in performing a protective patdown if they reasonably believed the defendants could be armed and dangerous, and, if such a finding is warranted, the remaining question is whether the patdown was within the parameters of *Terry*. *Dickerson*, 124 L Ed 2d 344. See 3 LaFave, Search and Seizure (2d ed), § 9.4(a), p 506. The defendants raised these issues before the Court of Appeals, and defendant Jones presents them to this Court; however, because of the finding of the Court of Appeals that the stop of the vehicle was unconstitutional, it was unnecessary for it to reach these questions.

Therefore, the case is reversed and remanded to the Court of Appeals for proceedings consistent with this opinion.

BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred with BRICKLEY, J.

CAVANAGH, C.J. (*dissenting*). In this case we are presented with the issue whether the trial court properly granted the defendants' motion to suppress evidence. A trial court's ruling on a motion to suppress evidence is entitled to deference and is not to be disturbed unless clearly erroneous. *People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983). Because the trial court's decision to suppress the evidence was not clearly erroneous, I would affirm the decision of the Court of Appeals.

---

[15] The prosecutor argues in the alternative that the police officers had a reasonable suspicion that a Jackson city ordinance making it unlawful to frequent any place where illegal business is conducted was violated, citing *People v Arterberry*, 431 Mich 381; 429 NW2d 574 (1988). Because of our resolution of this case in the people's favor, we need not address this argument.

I

In *Terry v Ohio,* 392 US 1, 30; 88 S Ct 1868; 20
L Ed 2d 889 (1968), the United States Supreme
Court recognized the constitutionality of what has
become known as a "Terry" stop. Under the rule
announced, an officer may temporarily detain a
person when the officer has an articulable, reason-
able suspicion that the defendant is involved, or
about to be involved, in criminal activity. The
great debate over the circumstances that permit a
finding of reasonable suspicion continues, despite
the rule's twenty-five year history. While a con-
crete definition has yet to emerge, the basic guide-
lines, as announced in *Terry,* remain instructive:

> [I]n making that assessment it is imperative that
> the facts be judged against an objective standard:
> would the facts available to the officer at the
> moment of the seizure or the search "warrant a
> man of reasonable caution in the belief" that the
> action taken was appropriate? Anything less
> would invite intrusions upon constitutionally guar-
> anteed rights based on nothing more substantial
> than inarticulable hunches, a result this Court has
> consistently refused to sanction. And simple
> " 'good faith on the part of the arresting officer is
> not enough.' . . . If subjective good faith alone
> were the test, the protections of the Fourth
> Amendment would evaporate, and the people
> would be 'secure in their persons, houses, papers,
> and effects,' only in the discretion of the police."
> [*Id.* at 21-22. Citations omitted.]

The continued requirement for a valid "Terry"
stop is that the police must possess an articulable,
reasonable suspicion that criminal activity is afoot.
See *United States v Sutton,* 794 F2d 1415, 1426
(CA 9, 1986). An "inchoate" or "unparticularized
suspicion or hunch" is not sufficient to provide the

basis for a reasonable suspicion. *United States v Sokolow,* 490 US 1, 7; 109 S Ct 1581; 104 L Ed 2d 1 (1989). "[A]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Sutton* at 1426. In evaluating the validity of an alleged "Terry" stop, courts must consider the totality of the circumstances and supported, reasonable inferences. *Sokolow* at 8.

II

I would hold that the trial court properly concluded, under the totality of the circumstances, that the police lacked reasonable suspicion when they stopped the defendants.

A

Contrary to the state's assertion, the defendants' visit to an alleged "crack house,"[1] without addi-

---

[1] Furthermore, I am not convinced that the facts presented support the conclusion that 515 Oak Street was a typical "crack house." As the trial court correctly noted, 515 Oak Street was a residence with furniture and the amenities generally found in a home. A family occupied the home, characteristics that are *inconsistent* with the profile of a typical "crack house." For this reason, we can assume visitors occasionally came to the premises for legitimate reasons.

The police failed to search Gibson, the third party who allegedly purchased cocaine from 515 Oak Street. Thus, one could only speculate regarding the true vendor of the cocaine—Gibson or the occupant of the home. The police did not know Gibson and could not credibly vouch for his reliability.

"[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." [*People v Shabaz,* 424 Mich 42, 55; 378 NW2d 451 (1985).]

Officers versed in the field of law enforcement know that informants must be reliable. They routinely search informants used in drug purchases, regardless of their past reliability, to provide support and credibility to the investigation. While the police identified and acted on the need to search the known, *reliable* informant and her vehicle,

tional questionable conduct by the defendants, does not provide a sufficient basis for a determination of reasonable suspicion. In *People v Shabaz,* 424 Mich 42, 60-61; 378 NW2d 451 (1985), this Court held that the defendant's presence in a high-crime neighborhood and departure from an apartment building where previous concealed-weapons and narcotics arrests had been made did not provide the basis to formulate a reasonable suspicion.[2] While the majority goes to great lengths to factually distinguish the case at bar from *Shabaz,* I believe the basic principle remains—the departure from a known or suspected criminal location, without more, does not transform a person into a criminal, providing the basis for reasonable suspicion. See also *Ybarra v Illinois,* 444 US 85; 100 S Ct 338; 62 L Ed 2d 238 (1979).[3]

the police did not have the opportunity to search Gibson. The police were fully aware of the necessity for such precautions, yet the police disregarded established procedure and drew conclusions on the basis of representations made by an unknown, uninformed, unsearched third party. This Court should not reward careless police work by allowing it to justify intrusions on the Fourth Amendment rights of the citizens of the State of Michigan.

[2] While the crime rate in a neighborhood may be a valid consideration to be taken into account when assessing reasonable suspicion, that alone would not establish the grounds for an investigatory stop. Defendant's presence in a high-crime neighborhood does nothing to distinguish him from any number of other pedestrians in the area. It provides no particular reasonable basis for suspicion as to the activity of the defendant. The same must be said for his emergence from an apartment building known to the police to be the site of previous criminal activity. It cannot reasonably be concluded that everyone seen carrying a small paper bag, entering or leaving an apartment building where previous concealed-weapons and narcotics arrests have been made, is likely to be involved in such activity. [*Id.* at 60-61. Citations omitted.]

[3] This conclusion is supported by the Minnesota Supreme Court decision *State v Dickerson,* 481 NW2d 840, 843 (Minn, 1992), aff'd on other grounds 508 US —; 113 S Ct 2130; 124 L Ed 2d 334 (1993). The court stressed that the defendant's evasive conduct *combined* with his departure from a high-crime building justified a finding of reasonable suspicion.

Admittedly, under the above-stated principle, a finding of reasonable suspicion would be warranted if the defendants had acted evasively or suspiciously. According to the prosecutor, the defendants' brief visit to the residence warranted their detention because brief visits are indicative of illegal drug transactions. Our holding in *Shabaz* is once again instructive.

In *Shabaz,* this Court held that the defendant's departure from an apartment complex, the scene of past criminal activity, coupled with the stuffing of a brown paper bag in his pants and his flight upon observing undercover officers watching him, did not provide a sufficient basis for a finding of reasonable suspicion. The Court stated that the defendant's attempt to conceal the brown paper bag, by itself, did not provide grounds for a stop. The Court reasoned that the bag could have contained one of a number of lawful items or contraband.

> It is precisely because the officers could only speculate about the contents of the bag that they had no reasonable or articulable basis to conclude what its contents were.
>
> *       *       *
>
> Because the police could only guess about what defendant was seeking to hide, their speculation did not provide a particularized suspicion of possessory wrongdoing, but only a generalized one. [*Shabaz* at 61.]

Similarly, the police, in the case at bar, could only

---

We have held that one circumstance giving rise to reasonable suspicion is evasive conduct. As the court of appeals and the defendant correctly point out, merely being in a high-crime area will not justify a stop. But defendant's evasive conduct after eye contact with police, combined with his departure from a building with a history of drug activity, justified police in reasonably suspecting criminal activity. [Citations omitted.]

guess or speculate regarding the nature of the defendants' brief visit. Because the police could only speculate, they lacked an articulable, reasonable suspicion to believe that the defendants were involved in criminal activity.

According to the arresting officers, the only overt act *by the defendants* providing the basis for their detention was the defendants' brief visit to the residence. The defendants made no gestures indicative of criminal conduct or movements that could suggest an attempt to conceal contraband. Once in their vehicle the defendants did not drive erratically or otherwise fail to comply with the motor vehicle code. In short, the police knew nothing in particular about the defendants except that they briefly visited a residence suspected of drug activity. When reviewing the constitutionality of an alleged "Terry" stop, the observed acts, under the totality of the circumstances

> *must raise a suspicion that the particular individual being stopped* is engaged in wrongdoing. [Emphasis added.] Chief Justice Warren, speaking for the Court in *Terry v Ohio, supra,* said that "[t]his demand for specificity in the information upon which police action is predicated *is the central teaching of this Court's Fourth Amendment jurisprudence.*" [*United States v Cortez,* 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981). Emphasis in original.]

The facts observed by the Jackson police failed to provide a specific basis for concluding that *the defendants* were engaged, or were about to engage, in criminal activity. Because the police could not form a reasonable suspicion, the defendants' privacy interest under the Fourth Amendment outweighs the governmental interest at stake.

III

"If, upon our review of the record, we do not possess a definite and firm conviction that the trial court made a mistake, we must affirm." *Burrell* at 449. A review of the record supports the trial court's conclusion that the police lacked reasonable suspicion, rendering the detainment of the defendants unconstitutional. Accordingly, I would affirm the determination to suppress the evidence.

LEVIN, J., concurred with CAVANAGH, C.J.