Cavanagh, J.
(dissenting). The primary issue in this case is whether reasonable suspicion existed to stop and search a vehicle and its four black occupants. I would hold that (1) the officer effectuating the stop failed to articulate a particularized and objective basis that would lead a reasonable person to suspect the occupants of the vehicle of criminal activity, and (2) *206 evidence derived from the illegal stop is subject to analysis under the exclusionary rule.
i
The issue in this case implicates the Search and Seizure Clause of the Fourth Amendment of the United States Constitution,[1] which protects individuals against unreasonable searches and seizures conducted by governmental actors. Whren v United States, 517 US 806, 809-810; 116 S Ct 1769; 135 L Ed 2d 89 (1996). When a police officer detains, even temporarily, the occupants of a vehicle, they have been “seized” within the meaning of the Fourth Amendment. Delaware v Prouse, 440 US 648, 683; 99 S Ct 1391; 59 L Ed 2d 660 (1979). Thus, the question becomes whether the seizure of the defendants was constitutionally reasonable.
Our United States Supreme Court has spoken on the requisite test to be applied in cases involving an investigatory stop of criminal defendants. The Court has held that “[a]n automobile stop is thus subject to the constitutional imperative that it not be ‘unreasonable’ under the circumstances.” Whren at 810. In United States v Cortez, 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981), the United States Supreme Court stated that the totality of the circumstances inquiry, in the event of a Terry stop, should take into account the whole picture. On the basis of that whole picture, the detaining officers must have a particularized and objective basis for suspecting criminal activ *207 ity by the particular person stopped. In other words, to justify the seizure, the officer must act on more than an “inchoate and unparticularized suspicion or hunch.” Terry v Ohio, 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Instead, the officer must have at least “a particularized suspicion, based on an objective observation, that the person stopped has been, is, or is about to be engaged in criminal wrongdoing.” People v Shabaz, 424 Mich 42, 59; 378 NW2d 451 (1985).
When the seizure of a defendant is unreasonable because it does not comport with Terry, evidence flowing from that seizure may be suppressed as fruit of the poisonous tree. Wong Sun v United States, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963); Shabaz, supra. Pursuant to Wong Sun, “the fruits of the officers’ illegal action are not to be admitted as evidence unless an intervening independent act of free will purge the primary taint of the unlawful invasion.” Shabaz at 66.
h
In order to determine whether the stop in this case passes constitutional muster, we are required to consider the underlying facts as well as the deductions predicated upon the facts and to make a determination of whether the detaining officer had a reasonable, articulable, and particularized basis for detaining the defendants. The majority does a fair job of detailing the objective facts underlying this case and recapping Deputy Elder’s testimony. However, the majority occasionally commingles the facts with Deputy Elder’s deductions and with its own deductions, and omits a few facts that I find key to the case. This *208 opinion offers a disentangled version of the underlying events in order to separate the circumstances giving rise to Deputy Elder’s suspicions from the conclusions he drew on the basis of those factors. I find the distinction to be crucial, especially in light of the majority’s conclusions that an officer’s subjective deductions must be given special deference, and that factors not articulated by the officer may factor into a determination of whether a stop was objectively reasonable. Given the tests offered by the majority, I believe that the Court must distinguish which parts of Deputy Elder’s testimony amount to facts and which parts compose the officer’s articulated particularized reasonable suspicion. In addition, the Court should recognize which factors were extrinsic to the officer’s articulated basis for effectuating the stop.
Deputy Elder’s testimony in this case revealed the following facts common to both Oliver and Taylor. (1) Deputy Elder overheard a dispatch[2] that an armed robbery had just occurred at the Republic Bank and that two black male suspects had been last seen heading north on foot; (2) Deputy Elder spoke to two men outside a New York Carpet World, which was located north of the bank, who indicated that they had seen no one but some children across the street during the preceding ten minutes; (3) Deputy Elder then decided to go to the Westbay Apartments, which were located approximately one quarter mile west of the bank; (4) Deputy Elder came upon four black men in a car as they were exiting the Westbay Apartments complex, approximately ten to fifteen minutes *209 after hearing the dispatch; (5) Deputy Elder had previously observed that blacks lived at the Westbay Apartments complex; (6) according to Deputy Elder, the car’s occupants did not look in the direction of his patrol car when he passed within six to eight feet of them; (7) Deputy Elder doubled back, began following the car, and radioed for back-up[3]; (8) while being followed by Deputy Elder, the driver of the car drove cautiously and obeyed all traffic laws; (9) while being followed by Deputy Elder, the car drove west on one street, then turned south, then turned east, and then turned south again before being stopped.[4]
From these objective facts, Deputy Elder testified that his experience as a police officer led him to deduce the following: (1) that the Westbay Apartments complex would be an excellent place for someone to run on foot or to hide a getaway vehicle because it was close and secluded, (2) that if there were a getaway vehicle, it would likely have at least three occupants because an additional person usually drives the getaway vehicle, (3) that it was very unusual for people not to look at an officer or patrol car driving by, and (4) that by driving the speed limit, using turn signals, and making complete stops, the driver of the car seemed to be overcautious. The majority adds one additional deduction-that the defendants were acting suspiciously by driving a “circuitous” route while being tailed by Deputy Elder.
*210 m
According to the majority, reasonable suspicion is the sum total of all the circumstances presented by this case. I disagree. An analysis of the underlying facts and deductions reveals that Deputy Elder’s suspicions were generalized, rather than particularized, articulable, and reasonable. Deputy Elder failed to demonstrate that these particular defendants were acting in a fashion that would support a suspicion that they had been or were about to be engaged in criminal wrongdoing. As such, the stop lacked reasonableness and was unjustified. See Shabaz at 59.
This case boils down to a situation in which our defendants fell within the universe of possible suspects because they were of the race, gender, and minimal number described in the dispatch and because they were in the vicinity of the robbery shortly after the time that it had occurred. It is important to remember that the original description Deputy Elder heard was that two black men (not four), fled north (not west), on foot (not in a car). While Deputy Elder’s testimony provided reasons to justify his belief that he should look for a broader class of suspects than the dispatch described, it is crucial to recognize that many of the factors cited by Deputy Elder and relied upon by the majority would justify a stop of any grouping of two or more black males who happened to be traveling within the vicinity of the robbery at the time of Deputy Elder’s search. The law does not permit random stops of automobiles. Rather, officers may make a stop only when particularized *211 facts lead them to reasonably believe that the occupants have transgressed or will transgress some law.[5]
As a preliminary matter, it should also be recognized that the majority had to deduce that the Westbay Apartments complex was a reasonable place for Deputy Elder to look for suspects as a precursor to the conclusion that he had the requisite reasonable suspicion. Though Deputy Elder testified that he had headed to the Westbay Apartments complex after ruling out the area north of the bank, and also stated that a getaway car would probably be located in a secluded area, his search nonetheless began north of the bank and he made inquiries of individuals standing in a public parking lot. Thus, it is not entirely clear that the Westbay Apartments complex was an area any more suspicious than anywhere else near the robbery, or that Deputy Elder would have been any less suspicious of black males in a crowded park *212 ing lot. Further, Jackson is a mid-sized city with a population over 37,000; it seems reasonable to infer that there could be scores of places to hide a getaway vehicle. Additionally, ten to fifteen minutes had passed before Deputy Elder arrived at the Westbay Apartments. Given that the apartment complex was located only a block away from the bank, the amount of time that passed between when Deputy Elder received the dispatch and the time he encountered the defendants was well beyond the necessary time to escape. Thus, the passage of time made it less likely that there was a connection between the robbery and the presence of four black men.
Even assuming that it is appropriate to rely on the deduction that the Westbay Apartments complex was a reasonable place to hide a getaway car, almost all the factors noted in Deputy Elder’s testimony reveal only that he believed that he was in a location where the suspects might reasonably be when he stopped the defendants: he had ruled out the area near the New York Carpet World, he was within a quarter mile of the bank, he thought a getaway car might be hidden there, he thought it was within walking distance of the bank, and he knew blacks lived there. None of these factors were tied to our defendants. Similarly, Deputy Elder also offered a few factors that tend to show that the defendants were not precluded from the list of suspects: they were black, they were male, and there were at least two of them. At most, these collective observations by Deputy Elder narrowed the list of possible suspects. None of these factors would tie our specific defendants to the crime. While Deputy Elder may have been justified in stopping only black males in the vicinity, nothing in his testimony indi *213 cates that he was justified in stopping every grouping of black males in the vicinity, or these black males in particular.
Even if special weight is given to the fact that Deputy Elder believed the apartment complex would be a good place to hide a getaway vehicle and that at least three people would have been involved in the crime, the prosecution was still required to show that Deputy Elder believed that these particular defendants had been or were about to be engaged in criminal activity. Instead, a review of the factors leading to Deputy Elder’s suspicions of these particular defendants, as opposed to his suspicion of groups of black men in general, amount to nothing more than a hunch that they in fact may have been the robbers. For Fourth Amendment purposes, a hunch is an insufficient basis for initiating a stop. See Terry at 27.
In Oliver, Deputy Elder testified that he was familiar with the Westbay Apartments, that he knew from personal experience that black individuals lived there, and that it would not be unusual for black individuals to be coming out of the Westbay Apartments complex. These factors undercut the reasonableness of Deputy Elder’s suspicions that any particular black men or group of black men at the apartment complex were the bank robbers.[6] This is especially true in light of the fact that the officer had absolutely no descrip *214 tion of the suspects’ size, age, or clothing. Beyond the fact that the defendants were a group of black men traveling together in a car near the location of the robbery, Deputy Elder offered only two reasons for stopping these defendants: they over-cautiously followed all traffic laws, and they did not look at him when he drove by them. The majority wisely has chosen not to place emphasis on the fact that the defendants were obeying all traffic laws while being followed by a police officer. On cross-examination, Deputy Elder conceded that it is not unusual for persons followed by a marked police car to drive cautiously. The trial judge also found that the way the car was driven was not unusual, as an average citizen would drive similarly.
The final factor, that the defendants did not look at the patrol car when leaving the apartment complex, is the only other factor enunciated by Deputy Elder that *215 potentially tends to separate these particular defendants from the general populace of black men. With regard to this observation, the majority defers to Deputy Elder’s experience as a law enforcement officer, and concludes that courts may consider “evasive” behavior as a factor in determining whether reasonable suspicion exists. I believe that the majority places too much weight on this solitary factor, and I disagree with the majority’s analysis in several regards.
First, I disagree that the law somehow decisively supports the proposition that failure to look at a police officer constitutes a specific factor. The primary case relied upon by the majority is distinguishable. The majority cites Illinois v Wardlow, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000), for the proposition that, “nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.” Ante at 197. However, Wardlow involved a defendant who fled at the sight of police officers. Failure to react to police officers and reacting by fleeing are very different, even opposite, behaviors. Wardlow is in no way controlling. Thus, unlike the majority, see Ante at 198-199, n 9, I believe that pre-Wardlow decisions are of great value, and are more persuasive than the limited authority offered by the majority.[7]
*216 Second, while I agree that courts may consider an officer’s years of experience when determining whether his actions were reasonable, the majority overstates the degree of deference that must be given to an experienced police officer’s deductions. The majority relies in large part on People v Nelson, 443 Mich 626; 505 NW2d 266 (1993). Though Nelson did recognize that a certain degree of deference should be given to officers who draw inferences based on experiences with crimes occurring under similar circumstances or committed by similarly situated defendants, see id. at 636, an officer’s bald assertion that a particular situation looks like a criminal transaction to the officer is not enough to justify a Fourth Amendment intrusion. People v LoCicero (After Remand), 453 Mich 496, 506; 556 NW2d 498 (1996). Where an officer institutes an investigatory stop that is based on a mere hunch rather than reasonably articulated and particularized facts, deference must be given to the constitution in lieu of the officer’s years of experience.[8]
*217 Even if Deputy Elder’s conclusion that it is unusual for people to avoid looking at police is given a great deal of weight as the majority suggests, his observation is insufficient in and of itself to create reasonable suspicion in this case. The majority correctly points out that it does not suggest that “the mere fact that a car passes by a patrol car without any of its occupants looking at the patrol car would justify a traffic stop, but merely that such apparent avoidance of eye contact can be one factor that, together with others, may support a stop.” Ante at 199, n 9.
In sum, the factors cited by Deputy Elder in support of his decision to stop the defendants do not amount to reasonable suspicion. In this regard, I agree with the majority that the fact that four men are leaving an apartment complex is not suspicious.[9] Similarly, the majority correctly concludes that the fact *218 that the defendants fit within the description of possible suspects did not create particularized reasonable suspicion.[10] Additionally, I find nothing particularly suspicious about the fact that the defendants were leaving Westbay Apartments at the time Deputy Elder was patrolling the area, especially in light of Deputy Elder’s own testimony that it was not unusual for black men to be leaving the complex.[11] Similarly, I find nothing suspicious about the fact that the defen *219 dants were obeying all traffic laws. Again, I would point out that even Deputy Elder’s testimony indicated that it is not unusual for people to follow traffic laws when followed by a marked police car. Once these clearly nonsuspicious singular factors are subtracted from the list of factors offered by Deputy Elder, all we are left with is the fact that the defendants did not look at Deputy Elder’s patrol car. I agree with the majority that taken alone, the failure to look at a passing patrol car would not justify a traffic stop.[12] For these reasons, I would hold that Deputy Elder’s decision to stop the defendants was not predicated upon reasonable, articulable, and particularized suspicion.
IV
None of the factors cited by Deputy Elder as suspicious would justify the stop in this case in and of itself. Thus, the only way that particularized suspicion can be found on the facts offered by Deputy Elder is to conclude that the collection of unsuspicious behaviors offered by Deputy Elder somehow acted in tandem to create particularized reasonable suspicion. I would conclude that, in this case, the sum of zero suspicion and zero suspicion is zero suspicion.[13] In reaching an opposite conclusion, the majority turns to the facts of Terry, the original “stop and frisk” case. *220 According to the majority, “Terry illustrates how factors that in isolation appear innocent may, in combination, provide a police officer with reasonable suspicion to justify an investigative stop . . . Ante at 193. However, what the majority fails to recognize is that in Terry, the police officer observed particular individuals engaging in a series of behaviors that the officer believed to be characteristic of defendants preparing to commit a robbery. In the present case, Deputy Elder’s first glance of the defendants was at the moment he observed them pulling out of the parking lot at the Westbay Apartments. While he may have had a reason for heading toward the apartment complex, any deductions the officer made before encountering our defendants pertained to suspects in general and added nothing to the determination of whether these particular defendants had been or were about to be engaged in criminal wrongdoing as required by the Fourth Amendment. Thus, I believe the majority makes a fundamental error.
v
It is clear that reasonable suspicion has not been proven on the basis of the factors relied upon by Deputy Elder. The factors were not suspicious, either individually or collectively. However, the majority asserts that this Court should consider all the factors available to the police in determining whether the stop was justified, regardless of whether the officers subjectively relied upon those facts. Citing People v Arterberry, 431 Mich 381, 384; 429 NW2d 574 (1988). In particular, the majority finds significance in the fact that the defendants drove a “circuitous” route while being followed. I disagree with the majority that *221 a significant level of suspicion is objectively raised by the fact that a car full of persons being tailed by a police officer who doubled back to follow them choose not to drive the most direct route between two points along the path to an unknown destination. First of all, the officer’s suspicions were apparently aroused before he decided to follow the defendants, as indicated by his decision to double back and follow them. Moreover, it is impossible to say that the “route” they chose was “circuitous,” when they had not yet traveled to a specified destination when stopped. At most, we can conclude that they chose to drive a longer distance than necessary between two points. Moreover, it is entirely plausible that an innocent defendant would change course, hoping that the police officer would continue in another direction. Further, it is possible that a driver with a car full of passengers might be distracted in conversation, and travel in a direction he might not otherwise. If we are to look at the objective circumstances of this case, without regard to the officer’s subjective state of mind, then we must consider not only factors indicative of guilt, but also other possible innocent explanations for the defendants’ behavior.
Objectively viewed, I would not consider the defendant’s behavior to be particularly suspicious. Nothing indicates that these particular defendants had or were about to be engaged in cfiminal wrongdoing, as is required for a Fourth Amendment stop to be valid. Shabaz at 59. Rather, the officer acted upon an inchoate or unparticularized hunch. I would, therefore, hold that Deputy Elder’s actions were unreasonable under the circumstances, and that the stop was constitutionally invalid. See Whren at 810; Terry at 27. As *222 such, the fruits of the illegal stop are subject to an exclusionary rule analysis.
The unlawful invasion in this case was an illegal stop of a vehicle occupied by four men. The subsequent searches and seizures of the occupants produced the “fruits” sought to be suppressed. Wong Sun explained that, in determining whether evidence should be excluded as fruit of the poisonous tree, the question is “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has come by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Id. at 488. In this case, the evidence obtained appears to have come about directly by exploitation of the illegal stop.
The trial court’s decision to admit the evidence flowing from the stop was made without consideration for the exclusionary rule because the decision was based on an erroneous conclusion that the stop was reasonable. The Court of Appeals affirmance similarly found the exclusionary rule to be inapplicable.[14] Given the illegality of the stop, the exclusionary rule would be directly implicated. I would, therefore, reverse and remand for a determination of whether the “fruit” of the illegal stop came about by any legitimate, distinguishable means that would purge the taint of this unlawful seizure.
Kelly, J., concurred with Cavanagh, J.

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated ....

 In Oliver, Deputy Elder testified that he received a dispatch that was broadcast to all police agencies. In Taylor, he testified that he did not receive the dispatch directly, but heard some radio traffic.

 It is unclear at what point the officer radioed for back up. In Taylor, he testified it was at the point he turned around and began to follow the defendants. In Oliver, he indicated it was while he was already following them.

 In Oliver, Deputy Elder additionally testified about the fact that he had seen no black males either in vehicles or on foot before encountering the defendants.

 As we stated in Site v Dep’t of State Police, 443 Mich 744, 747; 506 NW2d 209 (1993), “there is no support in the constitutional history of Michigan for the proposition that the police may engage in warrantless and suspicionless seizures of automobiles for the purpose of enforcing criminal law . . .
Similarly, as we warned in People v Roache, 237 Mich 215, 224-225; 211 NW 742 (1927):
While we may take judicial notice of the fact that rum runners and bandits ride in automobiles, and use them to commit crimes and effect their escape, may we not also take judicial notice of the fact that where there is one bandit or rum runner passing over a public highway, there are thousands of respectable, law-abiding citizens who are doing likewise? The protection afforded by the constitution to such persons must be regarded as paramount to any right to be given a police officer to enable him to verify his ungrounded suspicion that a law is being violated.
The granting, if such were possible, to overzealous officers, of powers, the performance of which would invade constitutional rights of the citizen, would do more to retard the enforcement of the law than to promote it.

 As a matter of logic, searching for a black person in an area where there is a concentration of black people makes it less likely that any particular black individual is the one unknown individual you are searching for than if you were to see a black individual in an area where the black population is less concentrated.
With regard to the fact that Deputy Elder knew blacks lived at the Westbay Apartments, the majority writes,
*214 Deputy Elder never indicated that he went to the Westbay complex because “he knew from personal experience that black individuals lived there.” Post at 213. Instead, [Deputy Elder’s] comments in this regard were isolated responses to specific questions concerning what he had observed while he had been at the complex on a previous occasion looking for an apartment with his wife. [Ante at 204, n 13.]
I note that this opinion nowhere states that Deputy Elder went to the Westbay Apartments because he believed that he would find blacks there. The opinion simply points out that Deputy Elder himself testified that he knew that he was in an area where it was not unusual to see blacks leaving the apartment complex. Thus, his testimony is indicative of the fact that there was nothing inherently suspicious about the fact that our defendants were leaving the Westbay Apartments, and that Deputy Elder knew there was nothing suspicious about black individuals exiting the Westbay Apartments.
It is entirely irrelevant whether Deputy Elder’s testimony came to light in response to questions posed by defense counsel or whether he offered the information voluntarily. The fact remains that his testimony sheds light on whether his suspicions were reasonable and particularized.

 See United States v Dela Cruz-Tapia, 162 F3d 1275, 1280 (CA 10, 1998) (the lack of eye contact is so innocent or susceptible to varying interpretations as to be innocuous and does not afford a reasonable suspicion for a stop); United States v Garcia-Camacho, 53 F3d 244, 246-247 (CA 9, 1995) (tíre fact that occupants of a vehicle stared straight ahead when passing a marked police car cannot weigh in the balance of whether there existed a reasonable suspicion for a stop); United States v Halls, 40 F3d 275, 276 (CA 8, 1994) (merely avoiding eye contact with state troopers while driving a vehicle fails to give rise to a reasonable inference of illegal activity); United States v Pavelski, 789 F2d 485, 489 (CA 7, 1986) *216 (the fact that four men in a car failed to make eye contact with an officer cannot justify an investigatory stop); United States v Pacheco, 617 F2d 84, 87 (CA 5, 1980) (in assessing reasonable suspicion for stopping a vehicle, “the avoidance of eye contact can have no weight whatsoever”); United States v Lamas, 608 F2d 547, 549-550 (CA 5, 1979) (“testimony that the occupants of a car avoided eye contact with [the officer] as they passed” cannot weigh in the balance whatsoever “because of the precarious position travelers on our nation’s highways would be placed in if avoiding eye contact with an officer could be considered a suspicious reaction”).

 The majority places great reliance on Nelson, stating that “the facts of Nelson are instructive because they also involve defendants of whom the police were reasonably suspicious because of the location of occupants in a car near a location where criminal activity was known to have occurred.” Ante at 203. Nelson involved factors that were more particularized than the factors at issue in the present case. In Nelson, the police were on surveillance at a particular location where criminal activity had previously occurred and was suspected to occur again. The exact type of *217 activity the police were watching for in fact occurred before the time that the police stopped the defendants. In LoCicero at 503, this Court noted Nelson’s observation that
the detective watching the house testified “that on the basis of his twenty-three years experience, the defendant’s behavior was characteristic of a ‘crack-house’ buy: ‘a short visit, in/out back in the car and down the road.’ It was described as a ‘carbon copy’ of what had occurred two weeks earlier.” The Court concluded that this knowledge, coupled with the other information the police had regarding the house, formed the basis for reasonable suspicion justifying further inquiry.
Contrast these factors with what occurred in our case: the police knew that a crime occurred somewhere in the area, but they were not watching for the crime to be repeated; the police knew that suspects would likely be in the general area, but they did not know where; and the police did not observe behavior that amounted to a carbon copy of behavior they had previously seen while observing robbers.

 [I]n itself, there is certainly nothing suspicious about four men occupying a car that is leaving an apartment complex. [Ante at 194]

 The majority states:
[T]he fact that the car had at least three occupants and at least two black males indicated that its occupants were consistent with the description of the suspected perpetrators. Of course, that in itself would not provide the particularized suspicion necessary for a valid investigatory stop. [Ante at 194-195.]

 During oral argument before this Court, even the attorney for the people recognized that a Fourth Amendment problem could arise when an officer simply goes to an area near a crime scene where a high concentration of people fitting the description might be found, and then relies on something as minimal as the avoidance of eye contact to support a stop. The following discourse occurred:
Court: So let’s say the robbery were reported to have been committed by a senior citizen with gray hair. I presume if Elder drove to a nearby retirement center and waited for the first person coming out that had gray hair in the car and looked straight ahead, he could stop him.
Attorney: Boy, I’d have trouble with that one because in the first place, senior citizens with gray hair, statistically there are a lot more of them than ....
Court: Than black males?
Attorney: In the Jackson area, oh yes. If the facts of this had occurred in East Detroit, I’d be in really big trouble. I personally would not find reasonable suspicion in your case ....
The people’s attorney then went on to explain that the inquiry entails looking at the totality of the circumstances, and that a limiting description that cuts out over half the population would add support for a finding of reasonable suspicion. What the attorney failed to recognize is that Deputy Elder himself admitted that he was not in an area where the description was limited. Instead, he was in an area where it was not unusual to see black males.

 [N]one of this is to suggest that the mere fact that a car passes by a patrol car without any of its occupants looking at the patrol car would justify a traffic stop .... [Ante at 199, n 9.]

 Though the mEyority attempts to assert otherwise, the simple fact remains that nothing in the mEyority opinion shows that our particular defendants were any more suspicious than any other black men who would have been leaving the Westbay Apartments together.

 The Court of Appeals affirmed on grounds different than that offered by the trial court. However, the Court of Appeals conclusion that the defendant was lawfully arrested ignored the illegality of the initial stop. Thus, like the trial court, the Court of Appeals erred at the outset.