**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
**Maura D. Corrigan**

Justices
**Michael F. Cavanagh**
**Elizabeth A. Weaver**
**Marilyn Kelly**
**Clifford W. Taylor**
**Robert P. Young, Jr.**
**Stephen J. Markman**

**FILED JUNE 12, 2001**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                            No.  112341

JOEY DUANE OLIVER,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                            No.  115064

ANTHONY DUANE TAYLOR,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

These consolidated cases arise from the same bank robbery and ensuing police stop of a car in the city of Jackson. In each case, the defendant argues that incriminating evidence

resulting from the stop of the car should have been suppressed on the basis of the Fourth Amendment exclusionary rule. We conclude that the stop of the car was supported by reasonable suspicion and, thus, did not violate the Fourth Amendment. Accordingly, we agree with the refusal of the lower courts to suppress the evidence at issue.

## I.  FACTS AND PROCEDURAL HISTORY

Shortly before noon on December 1, 1994, an armed robbery was committed at a Republic Bank branch in Jackson. It was reported that two black males were the perpetrators and that they left the bank on foot. Pivotal to the issue at hand is the conduct of Jackson County Deputy Sheriff Roger Elder that led to his stopping of the motor vehicle containing both the defendants and two other passengers. Deputy Elder had been a sheriff's deputy for over sixteen years at the time of the suppression hearing in *Oliver*. Notably, the great bulk of Deputy Elder's service with the sheriff's department was with the road patrol division. Before that, he was a township police officer for about 2½ to three years. In the course of his career as a police officer, Deputy Elder was directly involved in investigating about twenty bank robberies.

Deputy Elder testified that while he was in his patrol car shortly before noon on the date of the robbery he (along

2

with other police officers in the area) heard a general dispatch that an armed robbery had just occurred at the Republic Bank at the corner of North and Wisner Streets in Jackson. This dispatch advised that the suspects were two black males last seen heading northbound on foot from the bank. When he heard the dispatch, Deputy Elder, who was north of the bank, headed south to the general area of the bank to look for suspects. Deputy Elder explained at the suppression hearing in *Oliver* that he was not looking for just two suspects,

> [b]ecause it's my experience in the years I've been a police officer, that there is almost always a getaway car in a bank robbery, and if there's a getaway car, there's at least one more person with it.[1]

In the course of driving toward the area of the armed robbery, Deputy Elder stopped at a New York Carpet World store where he encountered two store employees standing outside smoking cigarettes. This store was located north of the Republic Bank. Deputy Elder asked them if they had seen any black males running in the area, and they replied that they

---

[1] Deputy Elder likewise testified at the suppression hearing in *Taylor* that he was looking for at least three suspects:

> Well, it's been my experience in the past that there is usually someone nearby, in a robbery attempt, with a getaway vehicle, so I would look for at least three people.

had been outside for about ten minutes and had not seen anyone except children across the street at a school.

He next went to the Westbay Apartments complex because he thought that the apartment complex would have been an excellent place for someone on foot to run and a good place to hide a getaway vehicle. The Westbay Apartments were located on the corner of North and Brown Streets, which was the first major intersection along North Street to the west of the Republic Bank, and this area was secluded. The Westbay Apartments complex was within a quarter mile of the Republic Bank.

When Deputy Elder was turning into an entrance to the Westbay Apartments complex, he saw a green Mercedes with four black male occupants heading out of the driveway. Deputy Elder testified at the suppression hearing in *Oliver* that "[a]s I was passing by them [the occupants of the Mercedes], I turned and looked over at them, and all four subjects looked directly ahead. They would not, any of them, look over at me." Deputy Elder said that he found this "very unusual" because, on the basis of his nineteen years of experience as a police officer, "[w]ell basically, because people always look at the cops. When you drive by, they always look over

4

and see who's in the car or—they just always look at you."[2] Deputy Elder testified that he saw the Mercedes within ten or fifteen minutes of the dispatch regarding the bank robbery and that he passed within six to eight feet of the Mercedes when they passed by each other at the entrance to the apartment complex.

After this, apparently concluding that these individuals were possibly implicated in the robbery, Deputy Elder requested backup over his police radio because he had spotted a "possible suspect vehicle." Deputy Elder, driving his patrol car, then followed the Mercedes as it proceeded west on North Street, then south on Brown Street, then east on Ganson Street, and finally south on Wisner Street. In driving this route, the Mercedes went through the intersection of Wisner and Ganson Streets. It would have been a more direct route to that intersection from the Westbay Apartments for the Mercedes to have simply gone east on North Street and then turned south on Wisner Street. Notably, this more direct route would have

---

[2] Deputy Elder similarly testified at the suppression hearing in *Taylor* that no occupant of the Mercedes looked over at his patrol car. Deputy Elder explained that he found this significant because in his experience:

> Inevitably, when a patrol car drives by somebody, they [sic] always look over at you. Somebody in the vehicle will look at the patrol car.

taken the Mercedes by the location of the Republic Bank that was robbed in this case. When backup patrol cars arrived, Deputy Elder stopped the Mercedes on Wisner Street.

Eventually, when another sheriff's deputy patted down Casual Banks, one of the passengers in the Mercedes, he found a large amount of money, including a bundle of money with a bank wrapper on it, and a Michigan identification for defendant Oliver. Later at the police station, a wad of money was found on defendant Oliver, who was a passenger in the Mercedes. Defendant Taylor was the driver and owner of the Mercedes. A search of the trunk of the Mercedes at the police station located a bag containing money and a .32 caliber automatic pistol. Also, defendant Taylor eventually made statements to the police that were later used against him.

Notably, at each suppression hearing, the trial court credited Deputy Elder's testimony about the basic facts surrounding the traffic stop. Defendants do not challenge that determination, but rather accept the basic facts related by Deputy Elder, while arguing that he nevertheless did not have legal justification consistent with the Fourth Amendment to effect the traffic stop.

In each of these consolidated cases, the circuit court denied the respective defendant's motions to suppress the

**6**

incriminating evidence discussed above. The circuit court held, contrary to the defense position, that the traffic stop was supported by reasonable suspicion.

Thereafter, defendant Oliver entered a conditional guilty plea to conspiracy to commit armed robbery, MCL 750.157a, armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b. The condition was that defendant Oliver be able to appeal the trial court's ruling at the suppression hearing in his case. At a jury trial, defendant Taylor was found guilty of the same crimes to which defendant Oliver conditionally pleaded guilty.

In *Oliver*, the Court of Appeals declined to address whether there was reasonable suspicion to effect the traffic stop on the basis of its conclusion that defendant Oliver, as a passenger in the car, did not have "standing to challenge" admission of the evidence at issue under the Fourth Amendment exclusionary rule.[3] In *Taylor,* a different panel of the Court

_____

[3] In short, the panel in *Oliver* concluded that defendant Oliver could not challenge the search of Banks in which incriminating evidence was first found and that, accordingly, he could not challenge the location of other incriminating evidence as a result of the ensuing events. The parties in each case have argued the issue of the scope of the respective defendants' "standing to challenge," or in other words the extent to which they may avail themselves of the Fourth Amendment exclusionary rule if there were a violation of the Fourth Amendment. However, in light of our conclusion that the traffic stop was supported by reasonable suspicion (and,

(continued...)

7

of Appeals agreed with the trial court's conclusion that the stop of the car was a valid traffic stop supported by reasonable suspicion.

## II. ANALYSIS

A trial court's factual findings at a suppression hearing will not be reversed unless they are clearly erroneous. However, as in the present case, the application of constitutional standards regarding searches and seizures to essentially uncontested facts is not entitled to this level of deference. *People v LoCicero (After Remand),* 453 Mich 496, 500-501; 556 NW2d 498 (1996).

In *LoCicero, supra* at 501-502, this Court summarized the requirements for the police to make a valid investigatory stop based on reasonable suspicion consistently with constitutional protections:

> The brief detention of a person following an investigatory stop is considered a reasonable seizure if the officer has a "reasonably articulable suspicion" that the person is engaging in criminal activity. The reasonableness of an officer's suspicion is determined case by case on the basis of the totality of all the facts and circumstances. "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled

---

[3](...continued)
thus, did not violate the Fourth Amendment), we need not address these "standing to challenge" issues.

**8**

to draw from the facts in light of his experience."

Although this Court has indicated that fewer facts are needed to establish reasonable suspicion when a person is in a moving vehicle than in a house, some minimum threshold of reasonable suspicion must be established to justify an investigatory stop whether a person is in a vehicle or on the street.  [Citations omitted.]

Further, in determining whether the totality of the circumstances provide reasonable suspicion to support an investigatory stop, those circumstances must be viewed "as understood and interpreted by law enforcement officers, not legal scholars . . . ."  *People v Nelson,* 443 Mich 626, 632; 505 NW2d 266 (1993).  Also, "[c]ommon sense and everyday life experiences predominate over uncompromising standards."  *Id.* at 635-636.

In *Terry v Ohio,* 392 US 1, 30-31; 88 S Ct 1868; 20 L Ed 2d 889 (1968), the United States Supreme Court held that in certain circumstances a police officer may "stop" and briefly detain a person consistently with the Fourth Amendment  on the basis of reasonable suspicion that criminal activity may be afoot.  Notably, "[t]he type of intrusion authorized by [*Terry*] has been extended to permit investigative stops under various circumstances . . . ."  *Nelson,* at 631.

The facts of *Terry* are instructive.  In that case, plain clothes police detective Martin McFadden was assigned to

**9**

downtown Cleveland. He observed two men walking a street, each of them repeatedly stopping to look in the same store window. Then, they were joined by a third man who talked with them briefly. Officer McFadden "testified that after observing [the two men's] elaborately casual and oft-repeated reconnaissance of the store window on Huron Road, he suspected the two men of 'casing a job, a stick-up,' and that he considered it his duty as a police officer to investigate further." *Terry, supra* at 6. Officer McFadden also explained that he feared the men might have a gun. Officer McFadden stopped the three men and asked their names. When the men merely "mumbled something" in response, Officer McFadden grabbed one of them and patted down the outside of his clothing, finding a gun. Eventually, he conducted a similar search of another of the men and found a gun on him as well.

The following discussion in *Terry* illustrates how factors that in isolation appear innocent may, in combination, provide a police officer with reasonable suspicion to justify an investigative stop:

> "[Officer McFadden] had observed Terry, Chilton, and Katz go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street,

**10**

singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." [*Id.* at 22-23.]

Similarly, in itself, there is certainly nothing suspicious about four men occupying a car that is leaving an apartment complex. However, there were other factors in this case that provided Deputy Elder with reasonable suspicion to stop the car. First, as Deputy Elder explained in his testimony at both suppression hearings, he deduced that the two direct perpetrators of the bank robbery would most likely have the assistance of a getaway driver. Also, it was reported that the bank was robbed by two black males. Thus, the fact that the car had at least three occupants and at least two black males[4] indicated that its occupants were

---

[4] The car was occupied by four black males, but the important point is that it had at least three occupants and at least two of those were black males. If, for example, the car

(continued...)

**11**

consistent with the description of the suspected perpetrators.[5] Of course, that in itself would not provide the particularized suspicion necessary for a valid investigatory stop. See *LoCicero, supra* at 505.[6]

However, there were other factors that provided a particularized basis for Deputy Elder to reasonably suspect that occupants of the Mercedes in which defendants were present had been involved in the bank robbery. The car was spotted by Deputy Elder in the Westbay Apartments complex

_____

[4](...continued)
would have had two black male and two white male occupants, we do not see any way that would alter the reasonable suspicion analysis.

[5] We note that there are certainly many ways in which it would be inappropriate for the police to use race as a factor in performing their duties. However, no reasonable person would contend that the police should disregard race where it has been reported by eyewitnesses that a crime has been committed by a person of a particular race or skin color. Simply put, it would have made no sense in the case at hand for the police to have pursued non-black individuals as having been the individuals who actually robbed the bank. As the United States Court of Appeals for the Sixth Circuit observed in *United States v Waldron,* 206 F3d 597, 604 (CA 6, 2000), "[c]ommon sense dictates that, when determining whom to approach as a suspect of criminal wrongdoing, a police officer may legitimately consider race as a factor if descriptions of the perpetrator known to the officer include race."

[6] Thus, we certainly agree with the dissent that Deputy Elder would not have been "justified in stopping *every* grouping of black males in the vicinity . . . ." Slip op, p 11. However, as we set forth in this opinion, there were a number of factors that, in combination, provided particularized suspicion for the traffic stop at issue.

12

within fifteen minutes of the report of the bank robbery. The complex was located to the west of the bank along North Street and within a quarter mile of the bank. Deputy Elder had first essentially eliminated the direction north of the bank on the basis of two men outside the carpet store (which was north of the bank) telling him that they had not seen anyone go by in that direction. He testified that he went to the Westbay Apartments complex because that would have been an excellent place to hide a getaway vehicle as the apartment complex provided a secluded area to hide a car in contrast to the parking lots of businesses near the bank.[7] In this regard, the fact that the car was *leaving* the apartment complex was consistent with it being a getaway vehicle that was attempting to leave the general vicinity of the crime. Thus, the suspicion of Deputy Elder reasonably focused on the Westbay Apartments. These deductions by Deputy Elder are particularly entitled to deference because

> [i]n analyzing the totality of the circumstances,
> the law enforcement officers are permitted, if not

---

[7] At the suppression hearing in *Oliver,* Deputy Elder explained that a getaway vehicle was more often "in a hidden area somewhere close by" the site of a robbery than in front of the building. In *Taylor*, Deputy Elder testified at the suppression hearing that his "experience tells me that they wouldn't have put" the getaway car in the parking lot of a Wendy's restaurant or laundromat (which were apparently among the businesses near the bank) as opposed to a more secluded place.

13

required, to consider "the modes or patterns of operation of certain kinds of lawbreakers. From [this] data, a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person." [*Nelson, supra* at 636, quoting *United States v Cortez,* 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981).]

On top of this, the occupants of the Mercedes drew further suspicion on themselves by their atypical conduct in each declining to look in the direction of Deputy Elder's passing marked patrol car. As the deputy explained, in his experience as a police officer, this was highly unusual. There is no basis to conclude that this observation was inaccurate, and, accordingly, we defer to his substantial experience as a law enforcement officer. *LoCicero, supra* at 501-502.

For conduct to support a finding of a reasonable suspicion, it need be, as we are instructed by the United States Supreme Court, merely evasive. Indeed, the United States Supreme Court has quite recently stated that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v Wardlow,* 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000). In *Wardlow,* the defendant was standing next to a building holding an opaque bag in an area of Chicago known for heavy narcotics

**14**

trafficking.  When a four-car caravan of police cars[8] entered the area, the defendant looked in the direction of the officers and fled, eventually running through a gangway and an alley.  Ultimately, police officers stopped the defendant and conducted a patdown search for weapons, discovering a gun in the bag.  The United States Supreme Court held that there was reasonable suspicion to support this investigatory stop in light of the defendant's presence in an area of heavy narcotics trafficking, coupled with his unprovoked flight when he noticed the police.  In making this determination, the *Wardlow* Court stated:

> In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists.  Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.  [*Id.* at 124-125.]

Further, in *United States v Orozco,* 191 F3d 578, 582 (CA 5, 1999), the Fifth Circuit United States Court of Appeals approved consideration of the "overall behavior of the vehicle driver," including "the avoidance of eye contact" as one factor that might be considered in determining whether there was reasonable suspicion to support a traffic stop.  Likewise,

---

[8]  The police cars were involved in an effort to investigate drug transactions in the area.

we see no reason that the overall behavior of all occupants of a car in seeming to avoid looking in the direction of a marked police car cannot be considered as one factor in support of a finding of reasonable suspicion. Accordingly, we believe that Deputy Elder was entitled to rely on his perception that it was unusual that the occupants of the Mercedes seemed to avoid looking in his direction. As in *Wardlow,* we do not have, nor have we been offered, the benefit of any empirical studies rebutting Deputy Elder's experience-based conclusion regarding how people ordinarily react to marked police cars. Deputy Elder's observation that it was suspicious for all four occupants of a car not to look at his passing police car does not strike us as unreasonable. Indeed, it may well comport with "commonsense." Accordingly, we consider Deputy Elder's suspicion aroused by the occupants of the car not looking at his patrol car to be one factor that is properly considered, together with other factors such as the secluded nature of the apartment complex and that the apartments were located within a quarter mile of the bank, as supporting a finding of reasonable suspicion in this case.[9]

---

[9] We note that defendants have cited some pre-*Wardlow* decisions by panels of the United States Circuit Courts of Appeals indicating that avoidance of eye contact is not properly considered as a factor in support of a finding of reasonable suspicion. However, we regard these pre-*Wardlow*

(continued...)

**16**

In addition to the foregoing, the route followed by the Mercedes before the traffic stop provides another factor in support of the existence of reasonable suspicion. The Mercedes took a circuitous route to the intersection of Ganson and Wisner Streets before the traffic stop was actually effected.[10] This is particularly suspicious because it involved avoiding driving by the bank that had been robbed. The most direct route to that intersection from the Westbay

_____

[9](...continued) decisions to be of little value in light of the recognition in *Wardlow* that evasive conduct can be a factor supporting (or even providing the primary basis for) an investigatory stop. Moreover, we note that there are federal appellate decisions that consider an apparent avoidance of eye contact as one factor in support of a finding of reasonable suspicion. See, e.g., *United States v Brown,* 188 F3d 860, 864-865 (CA 7, 1999) (considering the defendant's "unusually nervous demeanor, including his failure to make eye contact" as one of "several distinct articulable bases" for reasonable suspicion); *United States v Robinson,* 119 F3d 663, 667 (CA 8, 1997) (concluding that "the fact that [the defendant] appeared nervous and the fact that he would not make eye contact" provided "[f]urther justification" for a finding of reasonable suspicion). Of course, none of this is to suggest that the mere fact that a car passes by a patrol car without any of its occupants looking at the patrol car would justify a traffic stop, but merely that such apparent avoidance of eye contact can be one factor that, together with others, may support a stop.

[10] The dissent states that "it is impossible to say that the 'route' they [the occupants of the car] chose was 'circuitous when they had not yet traveled to a specified destination when stopped. At most, we can conclude that they chose to drive a longer distance than necessary between two points." Slip op, p 21. We do not perceive the distinction that the dissent would draw in this regard. It seems plain to us that a route would be "circuitous" precisely because it involved driving longer than necessary.

**17**

Apartments would have been east on North Street and then south on Wisner Street to the intersection. This would have taken the car past the bank at the intersection of North and Wisner Streets. Instead, the car took a longer route by proceeding west on North Street, then south on Brown Street, and finally east on Ganson Street before reaching the intersection of Ganson and Wisner Streets.

We recognize that the route followed by the Mercedes was not mentioned in Deputy Elder's testimony and evidently was not subjectively relied on by the police in effecting the traffic stop. Nevertheless, the location of the bank robbery and the route followed by the Mercedes were obviously facts known to the police before the traffic stop occurred. Thus, these facts are appropriately considered in determining whether there was reasonable suspicion to support the traffic stop because, as this Court unanimously recognized in *People v Arterberry,* 431 Mich 381, 384; 429 NW2d 574 (1988):

> [T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. [Quoting *Scott v United States,* 436 US 128, 138; 98 S Ct 1717; 56 L Ed 2d 168 (1978).]

Accordingly, objective facts known to the police officers who effected the traffic stop should be considered in determining

**18**

whether the stop was justified by reasonable suspicion regardless of whether the officers subjectively relied on those facts.

We conclude that, under the totality of the circumstances, Deputy Elder's investigatory stop of the car at issue was supported by reasonable suspicion that occupants of that car may have been involved in the robbery of the Republic Bank. The reasons for that conclusion include: (1) the deputy encountered the car near the crime scene, given that the apartment complex was within a quarter mile of the bank; (2) the time was short, with at most fifteen minutes elapsing from the time of the report of the robbery to the traffic stop; (3) the car was occupied by individuals who comported with the limited description that the officer had at his disposal; (4) Deputy Elder had tentatively eliminated the direction north of the bank as an escape route on the basis of the information he received from the carpet store employees; (5) on the basis of his familiarity with the area and experience with crimes of this nature, Deputy Elder formed the reasonable and well-articulated hypothesis that the robbers had fled to the secluded Westbay Apartments; (6) the deputy also reasonably hypothesized on the basis of his experience that the robbers would use a getaway car to try to escape from the area; (7) Deputy Elder also reasonably inferred on the basis of his

**19**

experience that a driver would probably be at the getaway car waiting for the actual robbers; (8) the behavior of each of the car's four occupants in seeming to avoid looking in the direction of the deputy's marked police car was atypical; (9) the car was *leaving* the apartment complex, which is consistent with it being a getaway car whose occupants were attempting to leave the area; (10) the car followed a circuitous route that avoided driving by the site of the bank robbery.[11]

The viewpoint of the dissent may best be summed up in its statement that "in this case, the sum of zero suspicion and zero suspicion is zero suspicion." Slip op, p 19. Whatever the obvious merits of this proposition, we respectfully disagree that it bears any relevance to this case. The factors that we have discussed above as supporting a finding of reasonable suspicion were not each of "zero suspicion" in themselves. Rather, as we have acknowledged, while the degree

_____

[11] As the dissent indicates, there was testimony from Deputy Elder that the car that was stopped was being driven in a manner that seemed overly cautious because of the driver's strict compliance with traffic laws. Slip op, p 6. However, we place no reliance whatsoever on this strict compliance with the traffic laws in concluding that there was reasonable suspicion to support the present traffic stop. Indeed, we agree with the dissent that it would seem anomalous to consider the mere fact of strict compliance with the traffic laws as being a factor in support of a finding of reasonable suspicion of criminal activity. Of course, we do not mean to suggest that an act in compliance with the law *cannot* be a factor in support of reasonable suspicion.

of suspicion from each of the factors in isolation may have fallen short of providing reasonable particularized suspicion to support the present traffic stop, that does not mean that these factors properly considered in the aggregate would not provide reasonable suspicion to support the stop under the totality of the circumstances. The validity of such a cumulative analysis, as we have discussed, is well established in our law.

It is always possible, as the dissent does, to hypothesize innocent explanations for the circumstances preceding the traffic stop. That possibility alone cannot thwart the proper efforts of law enforcement to protect our communities. "*Terry* accepts the risk that officers may stop innocent people." *Wardlow, supra* at 126.[12] Indeed, the possibility that innocent people will more than infrequently be briefly detained during *valid* investigatory stops is foreshadowed by guiding United States Supreme Court precedent, given that the reasonable suspicion needed for such stops "requires a showing considerably less than preponderance of the evidence." *Id.* at 123. As this Court explained in 1993

---

[12] Indeed, the United States Supreme Court pointed out in *Wardlow* that "the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent." *Id.* at 126.

**21**

in *Nelson, supra* at 632:

> [T]he absence of apparent innocent behavior has never been a requirement for the suspicion required to make an investigatory stop. *United States v Sokolow,* 490 US 1, 9; 109 S Ct 1581; 104 L Ed 2d 1 (1989). The question is not whether the conduct is innocent or guilty. Very often what appears to be innocence is in fact guilt, and what is indeed entirely innocent may in some circumstances provide the basis for the suspicion required to make an investigatory stop. Thus, the focus is on the "'degree of suspicion that attaches to particular types of noncriminal acts.'" *Id.* at 10.

Indeed, the facts of *Nelson* are instructive because they also involve defendants of whom the police were reasonably suspicious because of the location of occupants in a car near a location where criminal activity was known to have occurred. In *Nelson,* a police informant bought a quantity of cocaine from a house that was under police surveillance. After about thirty minutes, a vehicle with three occupants (unconnected with the police informant) arrived at the house and remained for only four minutes. A detective with twenty-three years of experience testified that this behavior "was characteristic of a 'crack-house' buy." *Id.* at 629. Shortly after leaving the house, the car in *Nelson* was stopped to investigate the possible drug transaction. This Court*,* showing deference to the experience of the police detective, held that the stop was supported by reasonable suspicion, noting that the behavior in

**22**

that case "was indicative of drug trafficking." *Id.* at 637-638. This Court in *Nelson* noted—and rejected—the argument of one of the defendant's counsel in the trial court that there was no reasonable suspicion to support the traffic stop because there were innocent explanations for the conduct such as dropping off a birthday card or stopping to say hello. This Court pointedly stated that "[t]he question is not the number of scenarios that the imagination can conjure, but the degree of suspicion conferred on the seemingly legal conduct." *Id.* at 635. Accordingly, the existence of reasonable suspicion in the present case is not negated by the ability to imagine possible innocent explanations for the presence of the Mercedes at the apartment complex and the actions of the car's occupants.

In sum, the police in the present case stopped a car that contained at least three people in a situation where the police were looking for two bank robbers and expecting to find a getaway driver as well. Because the car had at least two black male occupants, its occupants were consistent with the description of the bank robbers. After Deputy Elder eliminated the direction north of the bank, the car was found leaving a secluded area close to the bank (indeed, within a

**23**

quarter mile) that was a logical hiding place.[13]  The occupants of the car drew further suspicion on themselves by appearing to a trained law enforcement officer to be evasive by declining to look in the direction of his marked police car as it passed close by the car.  Finally, the car followed a circuitous route that avoided the site of the bank robbery before the traffic stop.  While one or more of these factors in isolation may not have constituted reasonable suspicion to stop the car, under the totality of the circumstances, there was reasonable suspicion to justify the traffic stop in this case.

---

[13] While not expressly stated, the dissent seems to suggest that one of the reasons provided by Deputy Elder for investigating the Westbay Apartment complex may have been that "he knew blacks lived there."  See *post* at 10-12.  However, Deputy Elder never indicated that he went to the Westbay complex because "he knew from personal experience that black individuals lived there." *Post* at 11.  Instead, his comments in this regard were isolated responses to specific questions concerning what he had observed while he had been at the complex on a previous occasion looking for an apartment with his wife.  Accordingly, Deputy Elder's testimony does not reflect that he decided to go to the Westbay Apartments because of the number of African-Americans that may have lived there, but merely that he happened to know from an unrelated event that African-Americans lived there.

In any event, we, of course, agree with the dissent that there would be nothing reasonably suspicious about African-Americans merely being at the apartment complex.  Rather, as we have addressed, it is the particular circumstances surrounding the occupants of the car that was stopped in this case that provided reasonable suspicion for the present traffic stop.

## III. CONCLUSION

We conclude that, under the totality of the circumstances, the police had the necessary reasonable suspicion to justify the traffic stop underlying these consolidated cases. Accordingly, we affirm the judgment of the Court of Appeals in each case.[14]

CORRIGAN, C.J., and WEAVER, YOUNG, and MARKMAN, JJ., concurred with TAYLOR, J.

---

[14] We note that defendant Taylor makes arguments in his brief on appeal regarding issues other than the validity of the stop of the Mercedes and the scope of his standing to challenge the evidence obtained as a result of that stop. These issues are beyond the scope of defendant Taylor's application for leave to appeal that was previously granted by this Court. Accordingly, we decline to review those issues.

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                   No. 112341

JOEY DUANE OLIVER,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                   No. 115064

ANTHONY DUANE TAYLOR,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

    The primary issue in this case is whether reasonable suspicion existed to stop and search a vehicle and its four black occupants. I would hold that (1) the officer effectuating the stop failed to articulate a particularized and objective basis that would lead a reasonable person to

suspect the occupants of the vehicle of criminal activity, and (2) evidence derived from the illegal stop is subject to analysis under the exclusionary rule.

I

The issue in this case implicates the Search and Seizure Clause of the Fourth Amendment of the United States Constitution,[1] which protects individuals against unreasonable searches and seizures conducted by governmental actors. *Whren v United States*, 517 US 806, 809-810; 116 S Ct 1769; 135 L Ed 2d 89 (1996). When a police officer detains, even temporarily, the occupants of a vehicle, they have been "seized" within the meaning of the Fourth Amendment. *Delaware v Prouse*, 440 US 648, 683; 99 S Ct 1391; 59 L Ed 2d 660 (1979). Thus, the question becomes whether the seizure of the defendants was constitutionally reasonable.

Our United States Supreme Court has spoken on the requisite test to be applied in cases involving an investigatory stop of criminal defendants. The Court has held that "[a]n automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren* at 810. In *United States v Cortez*,

---

[1]
     The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . . .

2

449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981), the United States Supreme Court stated that the totality of the circumstances inquiry, in the event of a *Terry* stop, should take into account the whole picture. On the basis of that whole picture, the detaining officers must have a particularized and objective basis for suspecting criminal activity by the particular person stopped. In other words, to justify the seizure, the officer must act on more than an "inchoate and unparticularized suspicion or hunch." *Terry v Ohio*, 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Instead, the officer must have at least "a particularized suspicion, based on an objective observation, that the person stopped has been, is, or is about to be engaged in criminal wrongdoing." *People v Shabaz*, 424 Mich 42, 59; 378 NW2d 451 (1985).

When the seizure of a defendant is unreasonable because it does not comport with *Terry*, evidence flowing from that seizure may be suppressed as fruit of the poisonous tree. *Wong Sun v United States*, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963); *Shabaz, supra*. Pursuant to *Wong Sun*, "the fruits of the officers' illegal action are not to be admitted as evidence unless an intervening independent act of free will purge the primary taint of the unlawful invasion." *Shabaz* at 66.

In order to determine whether the stop in this case passes constitutional muster, we are required to consider the underlying facts as well as the deductions predicated upon the facts and to make a determination of whether the detaining officer had a reasonable, articulable, and particularized basis for detaining the defendants. The majority does a fair job of detailing the objective facts underlying this case and recapping Deputy Elder's testimony. However, the majority occasionally commingles the facts with Deputy Elder's deductions and with its own deductions, and omits a few facts that I find key to the case. This opinion offers a disentangled version of the underlying events in order to separate the circumstances giving rise to Deputy Elder's suspicions from the conclusions he drew on the basis of those factors. I find the distinction to be crucial, especially in light of the majority's conclusions that an officer's subjective deductions must be given special deference, and that factors not articulated by the officer may factor into a determination of whether a stop was objectively reasonable. Given the tests offered by the majority, I believe that the Court must distinguish which parts of Deputy Elder's testimony amount to facts and which parts compose the officer's articulated particularized reasonable suspicion. In addition,

4

the Court should recognize which factors were extrinsic to the officer's articulated basis for effectuating the stop.

Deputy Elder's testimony in this case revealed the following facts common to both *Oliver* and *Taylor*: (1) Deputy Elder overheard a dispatch[2] that an armed robbery had just occurred at the Republic Bank and that two black male suspects had been last seen heading north on foot; (2) Deputy Elder spoke to two men outside a New York Carpet World, which was located north of the bank, who indicated that they had seen no one but some children across the street during the preceding ten minutes; (3) Deputy Elder then decided to go to the Westbay Apartments, which were located approximately one quarter mile west of the bank; (4) Deputy Elder came upon four black men in a car as they were exiting the Westbay Apartment complex, approximately ten to fifteen minutes after hearing the dispatch; (5) Deputy Elder had previously observed that blacks lived at the Westbay Apartment complex; (6) according to Deputy Elder, the car's occupants did not look in the direction of his patrol car when he passed within six to eight feet of them; (7) Deputy Elder doubled back, began following

---

[2] In *Oliver*, Deputy Elder testified that he received a dispatch that was broadcast to all police agencies. In *Taylor*, he testified that he did not receive the dispatch directly, but heard some radio traffic.

the car, and radioed for back-up[3]; (8) while being followed by Deputy Elder, the driver of the car drove cautiously and obeyed all traffic laws; (9) while being followed by Deputy Elder, the car drove west on one street, then turned south, then turned east, and then turned south again before being stopped.[4]

From these objective facts, Deputy Elder testified that his experience as a police officer led him to deduce the following: (1) that the Westbay Apartment complex would be an excellent place for someone to run on foot or to hide a getaway vehicle because it was close and secluded, (2) that if there were a getaway vehicle, it would likely have at least three occupants because an additional person usually drives the getaway vehicle, (3) that it was very unusual for people not to look at an officer or patrol car driving by, and (4) that by driving the speed limit, using turn signals, and making complete stops, the driver of the car seemed to be overcautious. The majority adds one additional deduction—that the defendants were acting suspiciously by driving a

---

[3] It is unclear at what point the officer radioed for back up. In *Taylor*, he testified it was at the point he turned around and began to follow the defendants. In *Oliver*, he indicated it was while he was already following them.

[4] In *Oliver*, Deputy Elder additionally testified about the fact that he had seen no black males either in vehicles or on foot before encountering the defendants.

6

"circuitous" route while being tailed by Deputy Elder.

## III

According to the majority, reasonable suspicion is the sum total of all the circumstances presented by this case. I disagree. An analysis of the underlying facts and deductions reveals that Deputy Elder's suspicions were generalized, rather than particularized, articulable, and reasonable. Deputy Elder failed to demonstrate that these particular defendants were acting in a fashion that would support a suspicion that they had been or were about to be engaged in criminal wrongdoing. As such, the stop lacked reasonableness and was unjustified. See *Shabaz* at 59.

This case boils down to a situation in which our defendants fell within the universe of possible suspects because they were of the race, gender, and minimal number described in the dispatch and because they were in the vicinity of the robbery shortly after the time that it had occurred. It is important to remember that the original description Deputy Elder heard was that two black men (not four), fled north (not west), on foot (not in a car). While Deputy Elder's testimony provided reasons to justify his belief that he should look for a broader class of suspects than the dispatch described, it is crucial to recognize that many of the factors cited by Deputy Elder and relied upon by

7

the majority would justify a stop of any grouping of two or more black males who happened to be traveling within the vicinity of the robbery at the time of Deputy Elder's search. The law does not permit random stops of automobiles. Rather, officers may make a stop only when particularized facts lead them to reasonably believe that the occupants have transgressed or will transgress some law.[5]

As a preliminary matter, it should also be recognized that the majority had to deduce that the Westbay Apartment complex was a reasonable place for Deputy Elder to look for

---

[5] As we stated in *Sitz v Dep't of State Police*, 443 Mich 744, 747; 506 NW2d 209 (1993), "there is no support in the constitutional history of Michigan for the proposition that the police may engage in warrantless and suspicionless seizures of automobiles for the purpose of enforcing criminal law . . . ."

Similarly, as we warned in *People v Roache*, 237 Mich 215, 224-225; 211 NW 742 (1927):

> While we may take judicial notice of the fact that rum runners and bandits ride in automobiles, and use them to commit crimes and effect their escape, may we not also take judicial notice of the fact that where there is one bandit or rum runner passing over a public highway, there are thousands of respectable, law-abiding citizens who are doing likewise? The protection afforded by the constitution to such persons must be regarded as paramount to any right to be given a police officer to enable him to verify his ungrounded suspicion that a law is being violated.

> The granting, if such were possible, to over-zealous officers, of powers, the performance of which would invade constitutional rights of the citizen, would do more to retard the enforcement of the law than to promote it.

8

suspects as a precursor to the conclusion that he had the requisite reasonable suspicion. Though Deputy Elder testified that he had headed to the Westbay Apartment complex after ruling out the area north of the bank, and also stated that a getaway car would probably be located in a secluded area, his search nonetheless began north of the bank and he made inquiries of individuals standing in a public parking lot. Thus, it is not entirely clear that the Westbay Apartment complex was an area any more suspicious than anywhere else near the robbery, or that Deputy Elder would have been any less suspicious of black males in a crowded parking lot. Further, Jackson is a mid-sized city with a population over 37,000; it seems reasonable to infer that there could be scores of places to hide a getaway vehicle. Additionally, ten to fifteen minutes had passed before Deputy Elder arrived at the Westbay Apartments. Given that the apartment complex was located only a block away from the bank, the amount of time that passed between when Deputy Elder received the dispatch and the time he encountered the defendants was well beyond the necessary time to escape. Thus, the passage of time made it less likely that there was a connection between the robbery and the presence of four black men.

Even assuming that it is appropriate to rely on the deduction that the Westbay Apartment complex was a reasonable

place to hide a getaway car, almost all the factors noted in Deputy Elder's testimony reveal only that he believed that he was in a location where the suspects might reasonably be when he stopped the defendants: he had ruled out the area near the New York Carpet World, he was within a quarter mile of the bank, he thought a getaway car might be hidden there, he thought it was within walking distance of the bank, and he knew blacks lived there. None of these factors were tied to our defendants. Similarly, Deputy Elder also offered a few factors that tend to show that the defendants were not precluded from the list of suspects: they were black, they were male, and there were at least two of them. At most, these collective observations by Deputy Elder narrowed the list of possible suspects. None of these factors would tie our specific defendants to the crime. While Deputy Elder may have been justified in stopping *only* black males in the vicinity, nothing in his testimony indicates that he was justified in stopping *every* grouping of black males in the vicinity, or these black males in particular.

Even if special weight is given to the fact that Deputy Elder believed the apartment complex would be a good place to hide a getaway vehicle and that at least three people would have been involved in the crime, the prosecution was still required to show that Deputy Elder believed that these

particular defendants had been or were about to be engaged in criminal activity. Instead, a review of the factors leading to Deputy Elder's suspicions of these particular defendants, as opposed to his suspicion of groups of black men in general, amount to nothing more than a hunch that they in fact may have been the robbers. For Fourth Amendment purposes, a hunch is an insufficient basis for initiating a stop. See *Terry* at 27.

In *Oliver*, Deputy Elder testified that he was familiar with the Westbay Apartments, that he knew from personal experience that black individuals lived there, and that it would not be unusual for black individuals to be coming out of the Westbay Apartment complex. These factors undercut the reasonableness of Deputy Elder's suspicions that any particular black men or group of black men at the apartment complex were the bank robbers.[6] This is especially true in

---

[6]As a matter of logic, searching for a black person in an area where there is a concentration of black people makes it less likely that any particular black individual is the one unknown individual you are searching for than if you were to see a black individual in an area where the black population is less concentrated.

With regard to the fact that Deputy Elder knew blacks lived at the Westbay Apartments, the majority writes,

> Deputy Elder never indicated that he went to the Westbay complex because "he knew from personal experience that black individuals lived there." *Post* at 11. Instead, Deputy Elder's comments in this regard were isolated responses to specific questions concerning what he had observed while he had been at the complex on a previous occasion
> (continued...)

light of the fact that the officer had absolutely no description of the suspects' size, age, or clothing.

Beyond the fact that the defendants were a group of black men traveling together in a car near the location of the robbery, Deputy Elder offered only two reasons for stopping these defendants: they over-cautiously followed all traffic laws, and they did not look at him when he drove by them. The majority wisely has chosen not to place emphasis on the fact that the defendants were obeying all traffic laws while being followed by a police officer. On cross-examination, Deputy Elder conceded that it is not unusual for persons followed by a marked police car to drive cautiously. The trial judge also found that the way the car was driven was not unusual, as an average citizen would drive similarly.

[6](...continued)
looking for an apartment with his wife. [Slip op at 24-25.]

I note that this opinion nowhere states that Deputy Elder went to the Westbay Apartments *because* he believed that he would find blacks there. The opinion simply points out that Deputy Elder himself testified that he knew that he was in an area where it was not unusual to see blacks leaving the apartment complex. Thus, his testimony is indicative of the fact that there was nothing inherently suspicious about the fact that our defendants were leaving the Westbay Apartments, and that Deputy Elder knew there was nothing suspicious about black individuals exiting the Westbay Apartments.

It is entirely irrelevant whether Deputy Elder's testimony came to light in response to questions posed by defense counsel or whether he offered the information voluntarily. The fact remains that his testimony sheds light on whether his suspicions were reasonable and particularized.

12

The final factor, that the defendants did not look at the patrol car when leaving the apartment complex, is the only other factor enunciated by Deputy Elder that potentially tends to separate these particular defendants from the general populace of black men.  With regard to this observation, the majority defers to Deputy Elder's experience as a law enforcement officer, and concludes that courts may consider "evasive" behavior as a factor in determining whether reasonable suspicion exists.  I believe that the majority places too much weight on this solitary factor, and I disagree with the majority's analysis in several regards.

First, I disagree that the law somehow decisively supports the proposition that failure to look at a police officer constitutes a specific factor.  The primary case relied upon by the majority is distinguishable.  The majority cites *Illinois v Wardlow*, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000), for the proposition that, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  Slip op at 14.  However, *Wardlow* involved a defendant who fled at the sight of police officers. Failure to react to police officers and reacting by fleeing are very different, even opposite, behaviors.  *Wardlow* is in no way controlling.  Thus, unlike the majority, see slip op at 16, n 8, I believe that pre-*Wardlow* decisions are of great

value, and are more persuasive than the limited authority offered by the majority.[7]

Second, while I agree that courts may consider an officer's years of experience when determining whether his actions were reasonable, the majority overstates the degree of deference that must be given to an experienced police officer's deductions. The majority relies in large part on *People v Nelson*, 443 Mich 626; 505 NW2d 266 (1993). Though *Nelson* did recognize that a certain degree of deference should be given to officers who draw inferences based on experiences with crimes occurring under similar circumstances or committed by similarly situated defendants, see *id.* at 636, an officer's

---

[7] See *United States v Dela Cruz-Tapia*, 162 F3d 1275, 1280 (CA 10, 1998)(the lack of eye contact is so innocent or susceptible to varying interpretations as to be innocuous and does not afford a reasonable suspicion for a stop); *United States v Garcia-Camacho*, 53 F3d 244, 246-247 (CA 9, 1995)(the fact that occupants of a vehicle stared straight ahead when passing a marked police car cannot weigh in the balance of whether there existed a reasonable suspicion for a stop); *United States v Halls*, 40 F3d 275, 276 (CA 8, 1994)(merely avoiding eye contact with state troopers while driving a vehicle fails to give rise to a reasonable inference of illegal activity); *United States v Pavelski*, 789 F2d 485, 489 (CA 7, 1986)(the fact that four men in a car failed to make eye contact with an officer cannot justify an investigatory stop); *United States v Pacheco*, 617 F2d 84, 87 (CA 5, 1980)(in assessing reasonable suspicion for stopping a vehicle, "the avoidance of eye contact can have no weight whatsoever"); *United States v Lamas*, 608 F2d 547, 549-550 (CA 5, 1979)("testimony that the occupants of a car avoided eye contact with [the officer] as they passed" cannot weigh in the balance whatsoever "because of the precarious position travelers on our nation's highways would be placed in if avoiding eye contact with an officer could be considered a suspicious reaction").

**bald assertion that a particular situation looks like a criminal transaction to the officer is not enough to justify a Fourth Amendment intrusion.** *People v LoCicero* (*After Remand*), 453 Mich 496, 506; 556 NW2d 498 (1996). **Where an officer institutes an investigatory stop that is based on a mere hunch rather than reasonably articulated and particularized facts, deference must be given to the constitution in lieu of the officer's years of experience.**[8]

---

[8] The majority places great reliance on *Nelson*, stating that "the facts of *Nelson* are instructive because they also involve defendants of whom the police were reasonably suspicious because of the location of occupants in a car near a location where criminal activity was known to have occurred." Slip op at 22. *Nelson* involved factors that were more particularized than the factors at issue in the present case. In *Nelson*, the police were on surveillance at a particular location where criminal activity had previously occurred and was suspected to occur again. The exact type of activity the police were watching for in fact occurred before the time that the police stopped the defendants. In *LoCicero* at 503, this Court noted *Nelson's* observation that

> the detective watching the house testified "that on the basis of his twenty-three years experience, the defendant's behavior was characteristic of a 'crack-house' buy: 'a short visit, in/out back in the car and down the road.' It was described as a 'carbon copy' of what had occurred two weeks earlier." The Court concluded that this knowledge, coupled with the other information the police had regarding the house, formed the basis for reasonable suspicion justifying further inquiry.

Contrast these factors with what occurred in our case: the police knew that a crime occurred somewhere in the area, but they were not watching for the crime to be repeated; the police knew that suspects would likely be in the general area, but they did not know where; and the police did not observe behavior that amounted to a carbon copy of behavior they had previously seen while observing robbers.

Even if Deputy Elder's conclusion that it is unusual for people to avoid looking at police is given a great deal of weight as the majority suggests, his observation is insufficient in and of itself to create reasonable suspicion in this case.  The majority correctly points out that it does not suggest that "the mere fact that a car passes by a patrol car without any of its occupants looking at the patrol car would justify a traffic stop, but merely that such apparent avoidance of eye contact can be one factor that, together with others, may support a stop."  Slip op at 17, n 8.

In sum, the factors cited by Deputy Elder in support of his decision to stop the defendants do not amount to reasonable suspicion.  In this regard, I agree with the majority that the fact that four men are leaving an apartment complex is not suspicious.[9]  Similarly, the majority correctly concludes that the fact that the defendants fit within the description of possible suspects did not create particularized reasonable suspicion.[10]  Additionally, I find nothing

---

[9]

> [I]n itself, there is certainly nothing suspicious about four men occupying a car that is leaving an apartment complex. [Slip op at 11.]

[10] The majority states:

> [T]he fact that the car had at least three occupants and at least two black males indicated that its occupants were consistent with the description of the suspected perpetrators.  Of
>                                         (continued...)

16

particularly suspicious about the fact that the defendants were leaving Westbay Apartments at the time Deputy Elder was patrolling the area, especially in light of Deputy Elder's own testimony that it was not unusual for black men to be leaving the complex.[11]  Similarly, I find nothing suspicious about the

---

[10](...continued)
course, that in itself would not provide the particularized suspicion necessary for a valid investigatory stop. [Slip op at 11-12.]

[11] During oral argument before this Court, even the attorney for the people recognized that a Fourth Amendment problem could arise when an officer simply goes to an area near a crime scene where a high concentration of people fitting the description might be found, and then relies on something as minimal as the avoidance of eye contact to support a stop.  The following discourse occurred:

> *Court*: So let's say the robbery were reported to have been committed by a senior citizen with gray hair.  I presume if Elder drove to a nearby retirement center and waited for the first person coming out that had gray hair in the car and looked straight ahead, he could stop him.

> *Attorney*: Boy, I'd have trouble with that one because in the first place, senior citizens with gray hair, statistically there are a lot more of them than . . . .

> *Court*: Than black males?

> *Attorney*: In the Jackson area, oh yes.  If the facts of this had occurred in East Detroit, I'd be in really big trouble.  I personally would not find reasonable suspicion in your case . . . .

The people's attorney then went on to explain that the inquiry entails looking at the totality of the circumstances, and that a limiting description that cuts out over half the population would add support for a finding of reasonable suspicion.  What the attorney failed to recognize is that Deputy Elder himself admitted that he was not in an area where the description was
(continued...)

fact that the defendants were obeying all traffic laws. Again, I would point out that even Deputy Elder's testimony indicated that it is not unusual for people to follow traffic laws when followed by a marked police car. Once these clearly nonsuspicious singular factors are subtracted from the list of factors offered by Deputy Elder, all we are left with is the fact that the defendants did not look at Deputy Elder's patrol car. I agree with the majority that taken alone, the failure to look at a passing patrol car would not justify a traffic stop.[12] For these reasons, I would hold that Deputy Elder's decision to stop the defendants was not predicated upon reasonable, articulable, and particularized suspicion.

IV

None of the factors cited by Deputy Elder as suspicious would justify the stop in this case in and of itself. Thus, the only way that particularized suspicion can be found on the facts offered by Deputy Elder is to conclude that the collection of unsuspicious behaviors offered by Deputy Elder somehow acted in tandem to create particularized reasonable

---

[11](...continued)
limited. Instead, he was in an area where it was not unusual to see black males.

[12]

 [N]one of this is to suggest that the mere fact that a car passes by a patrol car without any of its occupants looking at the patrol car would justify a traffic stop . . . . [Slip op at 17, n 8.]

suspicion.  I would conclude that, in this case, the sum of zero suspicion and zero suspicion is zero suspicion.[13]  In reaching an opposite conclusion, the majority turns to the facts of *Terry*, the original "stop and frisk" case.  According to the majority, "*Terry* illustrates how factors that in isolation appear innocent may, in combination, provide a police officer with reasonable suspicion to justify an investigative stop . . . ."  Slip op at 10.  However, what the majority fails to recognize is that in *Terry*, the police officer observed particular individuals engaging in a series of behaviors that the officer believed to be characteristic of defendants preparing to commit a robbery.  In the present case, Deputy Elder's first glance of the defendants was at the moment he observed them pulling out of the parking lot at the Westbay Apartments.  While he may have had a reason for heading toward the apartment complex, any deductions the officer made before encountering our defendants pertained to suspects in general and added nothing to the determination of whether these particular defendants had been or were about to be engaged in criminal wrongdoing as required by the Fourth Amendment.  Thus, I believe the majority makes a fundamental

_____

[13] Though the majority attempts to assert otherwise, the simple fact remains that nothing in the majority opinion shows that our particular defendants were any more suspicious than any other black men who would have been leaving the Westbay Apartments together.

**19**

error.

V

It is clear that reasonable suspicion has not been proven on the basis of the factors relied upon by Deputy Elder.  The factors were not suspicious, either individually or collectively.  However, the majority asserts that this Court should consider all the factors available to the police in determining whether the stop was justified, regardless of whether the officers subjectively relied upon those facts. Citing *People v Arterberry*, 431 Mich 381, 384; 429 NW2d 574 (1988).  In particular, the majority finds significance in the fact that the defendants drove a "circuitous" route while being followed.  I disagree with the majority that a significant level of suspicion is objectively raised by the fact that a car full of persons being tailed by a police officer who doubled back to follow them choose not to drive the most direct route between two points along the path to an unknown destination.  First of all, the officer's suspicions were apparently aroused before he decided to follow the defendants, as indicated by his decision to double back and follow them.  Moreover, it is impossible to say that the "route" they chose was "circuitous," when they had not yet traveled to a specified destination when stopped. At most, we can conclude that they chose to drive a longer distance than

20

necessary between two points. Moreover, it is entirely plausible that an innocent defendant would change course, hoping that the police officer would continue in another direction. Further, it is possible that a driver with a car full of passengers might be distracted in conversation, and travel in a direction he might not otherwise. If we are to look at the objective circumstances of this case, without regard to the officer's subjective state of mind, then we must consider not only factors indicative of guilt, but also other possible innocent explanations for the defendants' behavior.

Objectively viewed, I would not consider the defendant's behavior to be particularly suspicious. Nothing indicates that these particular defendants had or were about to be engaged in criminal wrongdoing, as is required for a Fourth Amendment stop to be valid. *Shabaz* at 59. Rather, the officer acted upon an inchoate or unparticularized hunch. I would, therefore, hold that Deputy Elder's actions were unreasonable under the circumstances, and that the stop was constitutionally invalid. See *Whren* at 810; *Terry* at 27. As such, the fruits of the illegal stop are subject to an exclusionary rule analysis.

The unlawful invasion in this case was an illegal stop of a vehicle occupied by four men. The subsequent searches and seizures of the occupants produced the "fruits" sought to be

21

suppressed. *Wong Sun* explained that, in determining whether evidence should be excluded as fruit of the poisonous tree, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has come by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488. In this case, the evidence obtained appears to have come about directly by exploitation of the illegal stop.

The trial court's decision to admit the evidence flowing from the stop was made without consideration for the exclusionary rule because the decision was based on an erroneous conclusion that the stop was reasonable. The Court of Appeals affirmance similarly found the exclusionary rule to be inapplicable.[14] Given the illegality of the stop, the exclusionary rule would be directly implicated. I would, therefore, reverse and remand for a determination of whether the "fruit" of the illegal stop came about by any legitimate, distinguishable means that would purge the taint of this unlawful seizure.

KELLY, J., concurred with CAVANAGH, J.

---

[14] The Court of Appeals affirmed on grounds different than that offered by the trial court. However, the Court of Appeals conclusion that the defendant was lawfully arrested ignored the illegality of the initial stop. Thus, like the trial court, the Court of Appeals erred at the outset.